## PHILLIPS PETROLEUM CO. *v.* WISCONSIN ET AL.

NO. 280.

Argued April 6–7, 1954.—Decided June 7, 1954.

*Hugh B. Cox* argued the cause for petitioner in No. 280. With him on the brief were *Rayburn L. Foster, Harry D. Turner* and *Stanley L. Temko.*

*Dan Moody* argued the cause for petitioners in No. 281. On the brief were *John Ben Shepperd,* Attorney General, *Charles E. Crenshaw,* Special Assistant Attorney General, and *Mr. Moody* for the State of Texas et al., *Mac Q. Williamson,* Attorney General of Oklahoma, for the Corporation Commission of Oklahoma, and *Richard H. Robinson,* Attorney General, and *George A. Graham,* Special Assistant Attorney General, for the State of New Mexico et al., petitioners. *J. Paull Marshall* was also of counsel.

*Solicitor General Sobeloff* argued the cause for the Federal Power Commission, petitioner in No. 418. With him on the brief were *Assistant Attorney General Burger, Melvin Richter, Willard W. Gatchell, William J. Grove* and *Louis C. Kaplan.*

*Stewart G. Honeck,* Deputy Attorney General of Wisconsin, *William E. Torkelson, Charles S. Rhyne, James H. Lee* and *Harry G. Slater* argued the causes for respondents. On a joint brief were *Vernon W. Thomson,* Attorney General, and *Mr. Honeck,* for the State of Wisconsin, *Mr. Torkelson* for the Public Service Commission of Wisconsin, *Mr. Lee* for the City of Detroit, Michigan, *David M. Proctor* and *Mr. Rhyne* for Kansas City, Missouri, and *Walter J. Mattison* and *Mr. Slater* for the City of Milwaukee, Wisconsin, respondents.

A brief of *amici curiae* urging reversal was filed by *Fred S. LeBlanc,* Attorney General, for the State of Louisiana, *J. P. Coleman,* Attorney General, for the State of Mississippi, *E. T. Christianson,* Attorney General, for the State of North Dakota, *Howard B. Black,* Attorney General, for the State of Wyoming, and *Jay Kyle* for the State Corporation Commission of Kansas. *J. Paull Marshall* was also of counsel.

Briefs of *amici curiae* urging affirmance were filed by *J. A. A. Burnquist,* Attorney General, and *George B. Sjoselius* for the State of Minnesota, *John F. Bonner* for the City of Minneapolis, Minnesota, *Leo A. Hoegh,* Attorney General, for the State of Iowa, and *Clarence S. Beck,* Attorney General, for the State of Nebraska; and by *J. W. Anderson, John J. Mortimer, Dale H. Fillmore, John C. Banks, Henry B. Curtis, Abraham L. Freedman, Alexander G. Brown, Dion R. Holm* and *Charles S. Rhyne* for the National Institute of Municipal Law Officers.

MR. JUSTICE MINTON delivered the opinion of the Court.

These cases present a common question concerning the jurisdiction of the Federal Power Commission over the rates charged by a natural-gas producer and gatherer in the sale in interstate commerce of such gas for resale. All three cases are an outgrowth of the same proceeding before the Power Commission and involve the same facts and issues.

The Phillips Petroleum Company [1] is a large integrated oil company which also engages in the production, gathering, processing, and sale of natural gas. We are here concerned only with the natural-gas operations. Phillips is

---

[1] Hereinafter referred to as Phillips.

known as an "independent" natural-gas producer in that it does not engage in the interstate transmission of gas from the producing fields to consumer markets and is not affiliated with any interstate natural-gas pipeline company. As revealed by the record before us, however, Phillips does sell natural gas to five interstate pipeline transmission companies which transport and resell the gas to consumers and local distributing companies in fourteen states.

Approximately 50% of this gas is produced by Phillips, and the remainder is purchased from other producers. A substantial part is casinghead gas—i. e., produced in connection with the production of oil. The gas flows from the producing wells, in most instances at well pressure, through a network of converging pipelines of progressively larger size to one of twelve processing plants, where extractable products and impurities are removed. Of the nine such networks of pipelines involved in these cases, five are located entirely in Texas, one in Oklahoma, one in New Mexico, and two extend into both Texas and Oklahoma. After processing is completed, the gas flows from the processing plant through an outlet pipe, of varying lengths up to a few hundred feet, to a delivery point where the gas is sold and delivered to an interstate pipeline company. The gas then continues its flow through the interstate pipeline system until delivered in other states.

The Federal Power Commission, on October 28, 1948, instituted an investigation to determine whether Phillips is a natural-gas company within the jurisdiction of the Commission, and, if so, whether its natural-gas rates are unjust or unreasonable. In extensive hearings before an examiner, the facts described above were developed, as well as much additional information. An intermediate decision having been dispensed with, the Commission

issued an opinion and order in which it held that Phillips is not a "natural-gas company" within the meaning of that term as used in the Natural Gas Act,[2] and therefore is not within the Commission's jurisdiction over rates.[3] Consequently, the Commission did not proceed to investigate the reasonableness of the rates charged by Phillips. On appeals, the decision of the Commission was reversed by the United States Court of Appeals for the District of Columbia Circuit, one judge dissenting. 92 U. S. App. D. C. 284, 205 F. 2d 706. We granted certiorari. 346 U. S. 934, 935.

The Power Commission is authorized by § 4 of the Natural Gas Act to regulate the "rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission . . . ." "Natural-gas company" is defined by § 2 (6) of the Act to mean "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." The jurisdiction of the Commission is set forth in § 1 (b) as follows:

> "The provisions of this Act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

---

[2] 52 Stat. 821, as amended, 15 U. S. C. § 717 et seq.

[3] 10 F. P. C. 246. One Commissioner concurred in the decision and one dissented.

Petitioners admit that Phillips engages in "the sale in interstate commerce of natural gas for resale," as, of course, they must. *Interstate Natural Gas Co.* v. *Federal Power Commission,* 331 U. S. 682, 687–689; cf. *Michigan-Wisconsin Pipe Line Co.* v. *Calvert,* 347 U. S. 157, 166–168. They contend, however, that the affirmative grant of jurisdiction over such sales in the first clause of § 1 (b) is limited by the negative second clause of the section. In particular, the contention is made that the sales by Phillips are a part of the "production or gathering of natural gas" to which the Commission's jurisdiction expressly does not extend.

We do not agree. In our view, the statutory language, the pertinent legislative history, and the past decisions of this Court all support the conclusion of the Court of Appeals that Phillips is a "natural-gas company" within the meaning of that term as defined in the Natural Gas Act, and that its sales in interstate commerce of natural gas for resale are subject to the jurisdiction of and regulation by the Federal Power Commission.

The Commission found that Phillips' sales are part of the production and gathering process, or are "at least an exempt incident thereof." [4] This determination appears to have been based primarily on the Commission's reading of legislative history and its interpretation of certain decisions of this Court. Also, there is some testimony in the record to the effect that the meaning of "gathering" commonly accepted in the natural-gas industry comprehends the sales incident to the physical activity of collecting and processing the gas. Petitioners contend that the Commission's finding has a reasonable basis in law and is supported by substantial evidence of record and therefore should be accepted by the courts, particularly since the Commission has "consistently" interpreted the Act

[4] 10 F. P. C. 246, 278.

as not conferring jurisdiction over companies such as Phillips.[5] See *Gray* v. *Powell*, 314 U. S. 402; *Labor Board* v. *Hearst Publications, Inc.*, 322 U. S. 111. We are of the opinion, however, that the finding is without adequate basis in law, and that production and gathering, in the sense that those terms are used in § 1 (b), end before the sales by Phillips occur.

In *Federal Power Commission* v. *Panhandle Eastern Pipe Line Co.*, 337 U. S. 498, 505, we observed that the "natural and clear meaning" of the phrase "production or gathering of natural gas" is that it encompasses "the producing properties and gathering facilities of a natural-gas company." Similarly, in *Colorado Interstate Gas Co.* v. *Federal Power Commission*, 324 U. S. 581, 598, we stated that "[t]ransportation and sale do not include production or gathering," and indicated that the "production or gathering" exemption applies to the physical activities, facilities, and properties used in the production and gathering of natural gas. *Id.*, at 602–603. See also *Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U. S. 591, 612–615; *Peoples Natural Gas Co.* v. *Federal Power Commission*, 75 U. S. App. D. C. 235, 127 F. 2d 153; cf. *United States* v. *Public Utilities Commission*, 345 U. S. 295, 307–311.[6]

---

[5] The consistency of the Commission in this regard may be questioned. Compare: *Columbian Fuel Corp.*, 2 F. P. C. 200, with *Interstate Natural Gas Co.*, 3 F. P. C. 416; Brief for Federal Power Commission, *Interstate Natural Gas Co.* v. *Federal Power Commission*, 156 F. 2d 949, with Brief for Federal Power Commission, *Interstate Natural Gas Co.* v. *Federal Power Commission*, 331 U. S. 682; Federal Power Commission Order No. 139, 12 Fed. Reg. 5585, with Federal Power Commission Order No. 154, 15 Fed. Reg. 4633. See Scanlan, Administrative Abnegation in the Face of Congressional Coercion: The Interstate Natural Gas Company Affair, 23 Notre Dame Law. 173; Note, 59 Yale L. J. 1468, 1479–1484. And, for that matter, even consistent error is still error.

[6] Referring to the taking of natural gas by purchasing interstate pipeline companies at the outlet of processing plants, we recently

Even more directly in point is our decision in *Interstate Natural Gas Co.* v. *Federal Power Commission*, 331 U. S. 682. The Interstate Company produced or purchased natural gas which it in turn sold and delivered to. three interstate pipeline companies, all the activities occurring within the same state. We noted that "[e]xceptions to the primary grant of jurisdiction in the section [1 (b)] are to be strictly construed," [7] *id.,* at 690–691, and held that § 1 (b) conferred jurisdiction over such sales on the Federal Power Commission, stating:

"Petitioner asserts . . . that the sales to the three pipe-line companies are a part of the gathering process and consequently not within the Commission's power of regulation. This basic contention has given rise to a great many subsidiary questions such as whether the sales were made from petitioner's 'gathering' lines or from petitioner's 'transmission' lines and whether the gathering process continued to the

observed that the pipeline companies obviously "are not engaged in 'gathering gas' within the meaning of that term in its ordinary usage . . . ." *Michigan-Wisconsin Pipe Line Co.* v. *Calvert*, 347 U. S. 157, 164.

[7] The committee reports on the bill enacted as the Natural Gas Act, H. R. 6586, 75th Cong., 1st Sess., reveal that a construction of the "production or gathering" exemption which would substantially limit the affirmative grant of jurisdiction to the Commission was not contemplated. After quoting the exemptive clause of § 1 (b), the House Report states that:

"The quoted words are not actually necessary, as the matters specified therein could not be said fairly to be covered by the language affirmatively stating the jurisdiction of the Commission, but similar language was in previous bills, and, rather than invite the contention, however unfounded, that the elimination of the negative language would broaden the scope of the act, the committee has included it in this bill." H. R. Rep. No. 709, 75th Cong., 1st Sess. 3.

The Senate Report adopted and reprinted the House Report on the bill. S. Rep. No. 1162, 75th Cong., 1st Sess.

points of sale or was, as the Commission found, completed at some point prior to surrender of custody and passage of title. We have found it unnecessary to resolve those issues. The gas moved by petitioner to the points of sale consisted of gas produced from petitioner's wells commingled with that produced and gathered by other companies and introduced into petitioner's pipe-line system during the course of the movement. By the time the sales are consummated, nothing further in the gathering process remains to be done. We have held that these sales are in interstate commerce. It cannot be doubted that their regulation is predominantly a matter of national, as contrasted to local concern. All the gas sold in these transactions is destined for consumption in States other than Louisiana. Unreasonable charges exacted at this stage of the interstate movement become perpetuated in large part in fixed items of costs which must be covered by rates charged subsequent purchasers of the gas, including the ultimate consumer. It was to avoid such situations.that the Natural Gas Act was passed." *Id.,* at 692–693.

Petitioners attempt to distinguish the *Interstate* case on the grounds that the Interstate Company transported the gas in its pipelines after completion of gathering and before sale, and that the Interstate Company was affiliated with an interstate pipeline company and therefore subject to Commission jurisdiction in any event. This Court, however, refused to rely on such refinements [8] and instead based its decision in *Interstate* on the broader ground that sales in interstate commerce for resale by

_____

[8] Despite the fact that they were urged by the Commission as a basis for decision. Brief for Federal Power Commission, *Interstate Natural Gas Co.* v. *Federal Power Commission,* 331 U. S. 682.

producers to interstate pipeline companies do not come within the "production or gathering" exemption.

The *Interstate* case is also said to be distinguishable in that it did not involve an asserted conflict with state regulation, and federal control was not opposed by the state authorities, while in the instant cases there are said to be conflicting state regulations, and federal jurisdiction is vigorously opposed by the producing states. The short answer to this contention is that the jurisdiction of the Federal Power Commission was not intended to vary from state to state, depending upon the degree of state regulation and of state opposition to federal control. We expressly rejected any implication to the contrary, in the *Interstate* case. 331 U. S., at 691–692. See *Federal Power Commission* v. *Hope Natural Gas Co., supra,* at 607–615.

The cases discussed above supply a ready answer to the determination of the Commission and also to petitioners' suggestion that "production or gathering" should be construed to mean the "business" of production and gathering, with the sale of the product considered as an integral part of such "business." We see no reason to depart from our previous decisions, especially since they are consistent with the language and legislative history of the Natural Gas Act.

In general, petitioners contend that Congress intended to regulate only the interstate pipeline companies since certain alleged excesses of those companies were the evil which brought about the legislation. If such were the case, we have difficulty in perceiving why the Commission's jurisdiction over the transportation *or* sale for resale in interstate commerce of natural gas is granted in the disjunctive. It would have sufficed to give the Commission jurisdiction over only those natural-gas companies that engage in "transportation" or "transportation *and* sale for resale" in interstate commerce, if only interstate

pipeline companies were intended to be covered.[9]  See *Federal Power Commission* v. *East Ohio Gas Co.,* 338 U. S. 464, 468.

Rather, we believe that the legislative history indicates a congressional intent to give the Commission jurisdiction over the rates of all wholesales of natural gas in interstate commerce, whether by a pipeline company or not and whether occurring before, during, or after transmission by an interstate pipeline company.[10]  There can be no dispute that the overriding congressional purpose was to plug the "gap" in regulation of natural-gas companies resulting from judicial decisions prohibiting, on

---

[9] Just such wording was suggested to and rejected by the House Committee considering enactment of the Natural Gas Act, by the Chairman of the State of New York Department of Public Service, Public Service Commission.  Hearings before House Committee on Interstate and Foreign Commerce on H. R. 4008, 75th Cong., 1st Sess. 146–147.

An earlier bill, H. R. 11662, 74th Cong., 2d Sess., would have limited the jurisdiction of the Power Commission to "the transportation of natural gas in high-pressure mains in interstate commerce and to natural-gas companies engaged in such transportation . . . ."  Much of the legislative history advanced in support of petitioners' position was developed in connection with this bill, including the testimony of Dozier A. DeVane, Solicitor of the Federal Power Commission.  Because of the much different jurisdictional provision of H. R. 11662, such testimony has little relevance here.

[10] The bill on which were held the hearings leading to the passage of the Natural Gas Act, H. R. 4008, 75th Cong., 1st Sess., as introduced provided, in § 1 (b), for Commission jurisdiction over the sale of natural gas in interstate commerce "for resale to the public."  Similarly, "natural-gas company" was defined, in § 2 (5), as including a person engaged in the sale of natural gas in interstate commerce "for resale to the public."  The General Solicitor of the National Association of Railroad and Utilities Commissioners suggested that the language be changed in a manner almost identical to that contained in the Natural Gas Act.  Referring to the proposed changes, he commented that:

"Another is designed to make certain that the bill will apply to all intercompany sales of natural gas at wholesale, even though the sale

federal constitutional grounds, state regulation of many of the interstate commerce aspects of the natural-gas business.[11] A significant part of this gap was created by cases [12] holding that "the regulation of wholesale rates of gas and electrical energy moving in interstate commerce is beyond the constitutional powers of the States." *Interstate Natural Gas Co.* v. *Federal Power Commission, supra,* at 689. The committee reports on the bill that became the Natural Gas Act specifically referred to two of these cases and to the necessity of federal regulation to occupy the hiatus created by them.[13] Thus, we are

---

be from one company to another company which will resell to another corporation before the gas is finally sold to the public." Hearings before House Committee on Interstate and Foreign Commerce on H. R. 4008, 75th Cong., 1st Sess. 22.
See also *id.,* at 141–143.

[11] *Federal Power Commission* v. *East Ohio Gas Co.,* 338 U. S. 464, 472–473; *Federal Power Commission* v. *Panhandle Eastern Pipe Line Co.,* 337 U. S. 498, 502–504; *Panhandle Eastern Pipe Line Co.* v. *Public Service Commission,* 332 U. S. 507, 514–521; *Interstate Natural Gas Co.* v. *Federal Power Commission,* 331 U. S. 682, 689–693; *Colorado Interstate Gas Co.* v. *Federal Power Commission,* 324 U. S. 581, 599–600; *Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U. S. 591, 609–610; *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.,* 314 U. S. 498, 506–508.

[12] *Missouri* v. *Kansas Natural Gas Co.,* 265 U. S. 298; *Public Utilities Commission* v. *Attleboro Steam & Electric Co.,* 273 U. S. 83; *State Corporation Commission* v. *Wichita Gas Co.,* 290 U. S. 561. Cf. *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282; *Lemke* v. *Farmers Grain Co.,* 258 U. S. 50; *Shafer* v. *Farmers Grain Co.,* 268 U. S. 189. And see *Jersey Central Power & Light Co.* v. *Federal Power Commission,* 319 U. S. 61, 69.

[13] "The States have, of course, for many years regulated sales of natural gas to consumers in intrastate transactions. The States have also been able to regulate sales to consumers even though such sales are in interstate commerce, such sales being considered local in character and in the absence of congressional prohibition subject to State regulation. . . . There is no intention in enacting the present legislation to disturb the States in their exercise of such jurisdiction. However, in the case of sales for resale, or so-called wholesale sales,

satisfied that Congress sought to regulate wholesales of natural gas occurring at both ends of the interstate transmission systems.

Petitioners cite our recent decisions in *Cities Service Gas Co.* v. *Peerless Oil & Gas Co.,* 340 U. S. 179, and *Phillips Petroleum Co.* v. *Oklahoma,* 340 U. S. 190, as authority for the proposition that the states may regulate the sales in question here and, hence, that such sales are not within the gap which the Natural Gas Act was intended to fill. Those cases upheld as constitutional state *minimum* price orders, justified as conservation measures, applying to sales of natural gas in interstate commerce. But it is well settled that the gap referred to is that thought to exist at the time the Natural Gas Act was passed, and the jurisdiction of the Commission is not affected by subsequent decisions of this Court which have somewhat loosened the constitutional restrictions on state activities affecting interstate commerce, in the absence of conflicting federal regulation. *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.,* 314 U. S. 498, 508; *Federal Power Commission* v. *East Ohio Gas Co., supra,* at 472. The Federal Power Commission did not participate in the *Cities Service* and *Phillips Petroleum* cases, the appellants there did not assert a possible conflict with federal authority under the Natural Gas Act, and consequently we expressly refused to consider at that time "[w]hether the Gas Act authorizes

in interstate commerce (for example, sales by producing companies to distributing companies) the legal situation is different. Such transactions have been considered to be not local in character and, even in the absence of Congressional action, not subject to State regulation. (See *Missouri* v. *Kansas Gas Co.* (1924), 265 U. S. 298, and *Public Service Commission* v. *Attleboro Steam & Electric Co.* (1927) 273 U. S. 83.) The basic purpose of the present legislation is to occupy this field in which the Supreme Court has held that the States may not act." H. R. Rep. No. 709, 75th Cong., 1st Sess. 1–2; S. Rep. No. 1162, 75th Cong., 1st Sess. 1–2.

the Power Commission to set field prices on sales by independent producers, or leaves that function to the states . . . ." 340 U. S., at 188–189.

Regulation of the sales in interstate commerce for resale made by a so-called independent natural-gas producer is not essentially different from regulation of such sales when made by an affiliate of an interstate pipeline company. In both cases, the rates charged may have a direct and substantial effect on the price paid by the ultimate consumers. Protection of consumers against exploitation at the hands of natural-gas companies was the primary aim of the Natural Gas Act. *Federal Power Commission* v. *Hope Natural Gas Co., supra,* at 610. Attempts to weaken this protection by amendatory legislation exempting independent natural-gas producers from federal regulation have repeatedly failed,[14] and we refuse to achieve the same result by a strained interpretation of the existing statutory language.

The judgment is

*Affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of these cases.

MR. JUSTICE FRANKFURTER, concurring.

While I join the opinion of the Court, one consideration leading to the Court's conclusion is for me so decisive that I deem it appropriate to give it emphasis.

Section 1 (b) is not to be construed on its face. It comes to us with an authoritative gloss. We must construe it as though Congress had, in words, added to

---

[14] Among the bills introduced in recent Congresses to restrict the existing jurisdiction of the Federal Power Commission over natural-gas producers are: H. R. 4051, 80th Cong., 1st Sess.; H. R. 4099, 80th Cong., 1st Sess.; H. R. 1758, 81st Cong., 1st Sess.; and S. 1498, 81st Cong., 1st Sess.

the present text of § 1 (b) some such language as the following:

"However, since sales for resale, or so-called 'wholesale sales,' in interstate commerce are not local in character and are constitutionally not subject to State regulation, see *Missouri* v. *Kansas Gas Co.,* 265 U. S. 298, and *Public Utilities Commission* v. *Attleboro Steam & Electric Co.,* 273 U. S. 83, the basic purpose of the legislation is to occupy this field in which the States may not act."

The section must be read with such an interpolation because the Committees of Congress which were responsible for the legislation said specifically that the Natural Gas Act was designed to cover the situations which the two cited cases held to be outside the competence of State regulation. H. R. Rep. No. 709, 75th Cong., 1st Sess. 1–2; S. Rep. No. 1162, 75th Cong., 1st Sess. 1–2.*

To be sure, the *Kansas Gas* case excluded the business of piping gas by a supply company in one State to dis-

---

*"The States have, of course, for many years regulated sales of natural gas to consumers in intrastate transactions. The States have also been able to regulate sales to consumers even though such sales are in interstate commerce, such sales being considered local in character and in the absence of congressional prohibition subject to State regulation. (See *Pennsylvania Gas Co.* v. *Public Service Commission* (1920), 252 U. S. 23.) There is no intention in enacting the present legislation to disturb the States in their exercise of such jurisdiction. However, in the case of sales for resale, or so-called wholesale sales, in interstate commerce (for example, sales by producing companies to distributing companies) the legal situation is different. Such transactions have been considered to be not local in character and, even in the absence of Congressional action, not subject to State regulation. (See *Missouri* v. *Kansas Gas Co.* (1924), 265 U. S. 298, and *Public Service Commission* v. *Attleboro Steam & Electric Co.* (1927) 273 U. S. 83.) The basic purpose of the present legislation is to occupy this field in which the Supreme Court has held that the States may not act." H. R. Rep. No. 709, 75th Cong., 1st Sess. 1–2.

tributing companies in another; and the *Attleboro* case involved the transmission of electric current by a producing company which took it from one State to the boundary of another State and there sold it to a distributing company for resale in the other State. In this case, the sale by Phillips was made in Texas to interstate pipeline transmission companies which transported the gas for resale to distributing companies and consumers in other States. But this fact—that Phillips itself did not pipe the gas to the State boundary or directly into another State—does not in the slightest alter the constitutional applicability of the *Attleboro* doctrine to the situation before us. The fact that the continuous transmission is not by facilities of Phillips but by the facilities of Phillips connecting with pipelines transmitting gas into other States does not change the interstate character of the transaction. For that reason, the decision in *Attleboro*, 273 U. S., at 86, relying on *Peoples Gas Co.* v. *Public Service Commission*, 270 U. S. 550, barred State regulation.

It may well be that if the problem in the *Attleboro* case came before the Court today, the constitutional doctrine there laid down would not be found compelling. This is immaterial. Congress did not leave it to the determination of this Court whether an *Attleboro* situation is subject to State regulation. It wrote the doctrine of the *Attleboro* case into the Natural Gas Act and said in effect that an *Attleboro* situation was to be taken over by federal regulation and was not to be left to the fluctuation of adjudications under the Commerce Clause.

Mr. Justice Douglas, dissenting.

The question is whether sales of natural gas by an *independent producer* at the mouth of an interstate pipeline are subject to regulation by the Federal Power Commission under the Natural Gas Act of 1938. This is

a question the Court has never decided. It is indeed one on which we expressly reserved decision in *Interstate Natural Gas Co. v. Federal Power Commission,* 331 U. S. 682, 690, n. 18.

There is much to be said from the national point of view for regulating sales at both ends of these interstate pipelines. The power of Congress to do so is unquestioned. Whether it did so by the Natural Gas Act of 1938 is a political and legal controversy that has raged in the Commission and in the Congress for some years. The question is not free from doubts. For while § 1 (b) of the Act makes the regulatory provisions applicable "to the sale in interstate commerce of natural gas for resale for ultimate public consumption," it also makes them inapplicable "to the production or gathering of natural gas."

The sale by this independent producer is a "sale in interstate commerce . . . for resale." It is also an integral part of "the production or gathering of natural gas," as MR. JUSTICE CLARK makes clear in his opinion, for it is the end phase of the producing and gathering process. So we must make a choice; and the choice is not an easy one.

The legislative history is not helpful. Congress was concerned with interstate pipelines, not with *independent producers,* as the thoughtful Comment in 59 Yale L. J. 1468 points out. If one can judge by the reports of the Federal Trade Commission that preceded the Act (S. Doc. No. 92, Pt. 84–A, 70th Cong., 1st Sess.), and the hearings and debates in Congress on the bills that evolved into the Act, little or no consideration was given to the need of regulating the sales by *independent producers* to the pipelines. The gap to be filled was that existing before the pipelines were brought under regulation—sales to distributors along the pipelines, as the opinion of MR. JUSTICE CLARK demonstrates.

That was the view of the Commission in a decision that followed on the heels of the Act. *Columbian Fuel Corp.*, 2 F. P. C. 200, 207. That decision exempted from regulation an independent producer to whom Phillips is in all material respects comparable. It was a decision made by men intimately familiar with the background and history of the Act—Leland Olds, Basil Manly, Claude L. Draper, and Clyde L. Seavey. One Commissioner, John W. Scott, dissented. That construction of the Act by the Commission has persisted from that time (see *Billings Gas Co.*, 2 F. P. C. 288; *The Fin-Ker Oil & Gas Production Co.*, 6 F. P. C. 92; *Tennessee Gas & Transmission Co.*, 6 F. P. C. 98) down to its decision in the present case. 10 F. P. C. 246.

That construction by the Commission, especially since it was contemporaneous (*United States* v. *American Trucking Assns.*, 310 U. S. 534, 539) and long continued (*Federal Power Commission* v. *Panhandle Eastern Pipe Line Co.*, 337 U. S. 498, 513), is entitled to great weight. Other obtuse questions no less legal in character than the terms "production or gathering" of gas have been entrusted to the administrative agency charged with the regulation. See *Shields* v. *Utah Idaho Central R. Co.*, 305 U. S. 177; *Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U. S. 381; *Gray* v. *Powell*, 314 U. S. 402.

There are practical considerations which buttress that position and lead me to conclude that we should not reverse the Commission in the present case. If Phillips' sales can be regulated, then the Commission can set a rate base for Phillips. A rate base for Phillips must of necessity include all of Phillips' producing and gathering properties; and supervision over its operating expenses necessarily includes supervision over its producing and gathering expenses. We held in *Colorado Interstate Gas Co.* v. *Federal Power Commission*, 324 U. S. 581, that the Commission's control extended that far in the case of an

interstate pipeline company which owned producing and gathering properties. And so it had to be, if regulation of the pipelines that owned their own gas supplies was to be effective. But an understanding of what regulation entails should lead to a different result in this case. The fastening of rate regulation on this *independent producer* brings "the production or gathering of natural gas" under effective federal control, in spite of the fact that Congress has made that phase of the natural gas business exempt from regulation. The effect is certain to be profound. The price at which the *independent producer* can sell his gas determines the price he is able or willing to pay for it (if he buys from other wells). The sales price determines his profits. And his profits and the profits of all the other gatherers, whose gas moves into the interstate pipelines, have profound effects on the rate of production, the methods of production, the old wells that are continued in production, the new ones explored, etc. Regulating the price at which the *independent producer* can sell his gas regulates his business in the most vital way any business can be regulated. That regulation largely nullifies the exemption granted by Congress.

There is much to be said in terms of policy for the position of Commissioner Scott, who dissented the first time the Commission ruled it had no jurisdiction over these sales. But the history and language of the Act are against it. If that ground is to be taken, the battle should be won in Congress, not here. Regulation of the business of producing and gathering natural gas involves considerations of which we know little and with which we are not competent to deal.

MR. JUSTICE CLARK, with whom MR. JUSTICE BURTON concurs, dissenting.

Perhaps Congress should have included control over the production and gathering of natural gas among the powers

it gave the Federal Power Commission in the Natural Gas Act, but this Congress did not do. On the contrary, Congress provided that the Act "shall not apply . . . to the production or gathering of natural gas." Language could not express a clearer command, but the majority renders this language almost entirely nugatory by holding that the rates charged by a wholly independent producer and gatherer may be regulated by the Federal Power Commission. Nor does the Court stop there, for in the sweep of the opinion "the rates of *all wholesales* of natural gas in interstate commerce, whether by a pipeline company or not and whether occuring before, during, or after transmission by an interstate pipeline company" are covered under the Act. *Ante,* p. 682. (Emphasis supplied.) On its face, this language brings every gas operator, from the smallest producer to the largest pipeline, under federal regulatory control. In so doing, the Court acts contrary to the intention of the Congress, the understanding of the states, and that of the Federal Power Commission itself. The Federal Power Commission is thereby thrust into the regulatory domain traditionally reserved to the states.

. The natural gas industry, like ancient Gaul, is divided into three parts. These parts are production and gathering, interstate transmission by pipeline, and distribution to consumers by local distribution companies. A business unit may perform more than one of these functions— typically, production and gathering in addition to interstate transmission. But Phillips' natural gas operations are confined exclusively to the first part—production and gathering. It has no interstate transmission or high-pressure trunk lines and does not sell to distribution companies; and it does not, of course, distribute to the ultimate consumer. Its nine gathering systems merely bring the gas from its own and other producers' wells to its central plants in the producing fields so it can be rendered usable as fuel. Since there are no facilities for storage,

the amount of gas, other than casinghead,* produced and gathered each day depends on the day-to-day demands of the interstate pipelines, which in turn depend on weather and other conditions in consuming areas. Gas wells are cut on and off as the market demand for the gas requires. Gathering takes place by well pressure forcing the gas through numerous small pipes connecting each well with the central gathering plant or processing station. It is there that the gas first comes to a common "header" and is processed for use as fuel. The processing of the gas at this central gathering plant is necessary to remove hydrocarbons, hydrogen sulphide and other foreign elements. in order to permit its use as fuel. The plant operates only while the wells are producing. All of Phillips' operations, including the acreage from which the wells produce the gas, the wells themselves, the lines that connect with each of them and run to the central plant, form a closely knit unit that is entirely local to the field involved. After processing, the gas is immediately delivered to the interstate pipelines under long-term sales contracts.

The Commission found that "[t]hough technically consummated in interstate commerce, these sales [by Phillips to the pipelines] are made 'during the course of production and gathering,'" and that the sales "are so closely connected with the local incidents of [production and gathering] as to render rate regulation by this Commission inconsistent or a substantial interference with

---

*Casinghead gas is produced with oil and furnishes the pressure under which the latter is brought to the surface. The gas cannot be shut off without closing down the oil production and it therefore is produced, regardless of demand, since the primary recovery is oil. If there are no available purchasers the gas is flared (burned). In some fields as much as one-third of the casinghead gas is still flared since no market is immediately available. Sound conservation practice dictates that, whenever possible, casinghead gas be used to satisfy demand before natural gas wells are turned on.

the exercise by the affected states of their regulatory functions." 10 F. P. C., at 278. We believe that this finding is correct and that it should be approved by the Court.

If there be any doubt that Congress thought the "production and gathering" exemption saved Phillips' sales from Federal Power Commission regulation, the Act's legislative history removes it. The Solicitor of the Commission, Mr. Dozier DeVane, at hearings in connection with a predecessor of the bill that finally became the Natural Gas Act, testified that the Federal Power Commission would have no jurisdiction over the rates for natural gas "that are paid in the gathering field." Hearings before Subcommittee of the House Committee on Interstate and Foreign Commerce on H. R. 11662, 74th Cong., 2d Sess., p. 28 (1936). The bill, he said, "does not attempt to regulate the gathering rates or the gathering business." *Id.*, 34. See also, *id.*, 42–43. The bill about which Mr. DeVane testified has been described as "substantially similar to the Natural Gas Act," and his views have been treated as authoritative by this Court. *Federal Power Commission* v. *Panhandle Eastern Pipe Line Co.*, 337 U. S. 498, 505, n. 7 (1949). See also *Federal Power Commission* v. *East Ohio Gas Co.*, 338 U. S. 464, 472, n. 12 (1950). In the face of this as well as the Federal Power Commission's adherence to the DeVane views ever since its first cases on the subject, *Columbian Fuel Corp.*, 2 F. P. C. 200 (1940), *Billings Gas Co.*, 2 F. P. C. 288 (1940), and in the absence of any specific matter in the Act's legislative history refuting the DeVane views, the Court today erroneously finds that DeVane's "testimony has little relevance here." *Ante*, p. 682, n. 9.

There is no dispute that Congress intended the Natural Gas Act to close the "gap" created by decisions of this Court barring state regulation of certain interstate gas sales. The legislative history of the Act refers to two

decisions: *Missouri* v. *Kansas Natural Gas Co.*, 265 U. S. 298 (1924); *Public Utilities Commission* v. *Attleboro Steam & Electric Co.*, 273 U. S. 83 (1927). See H. R. Rep. No. 709, 75th Cong., 1st Sess., pp. 1–2 (1937). But these cases had nothing to do with sales to interstate pipelines by wholly independent, unintegrated, and unaffiliated producers and gatherers, such as Phillips. Neither of the companies involved in those cases was engaged exclusively in production and gathering; both were producing and transportation companies, Kansas of natural gas, Attleboro of electricity; both Kansas and Attleboro sold to distributing companies in the course of interstate transmission. Thus, when the House Report, *id.*, 1–2, expressed the Act's aim to regulate wholesales such as "sales by producing companies to distributing companies," and immediately thereafter cited the *Kansas* and *Attleboro* cases, the Report's unmistakable reference was to sales by an integrated "producer-pipeline" to the local distributor. It could not refer to an independent producer and gatherer because, first, such an independent never sells to local distributors and, secondly, the two cited cases do not support a reference to such independents. That Congress aimed at abuses resulting in the "gap" at the end of the transmission process by integrated and unintegrated pipelines and not at abuses prior to transmission is clear from the final report of the Federal Trade Commission to the Senate on malpractices in the natural gas industry. S. Doc. No. 92, 70th Cong., 1st Sess. (1935). This report was the stimulus for federal intervention in the industry. The Federal Trade Commission outlined the abuses in the industry which the "gap" made the states powerless to prevent; the abuses were by monopolistically situated pipelines which gouged the consumer by charging local distribution companies unreasonable rates. The Federal Trade Commission did not find abusive pricing by independent producers and gatherers;

if anything, the independents at the producing end of the pipelines were likewise the victims of monopolistic practices by the pipelines.

And our decisions have certainly indicated that the "gap" was at the distribution end of the transmission process. Thus, in *Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U. S. 591 (1944), the Court observed that "the Federal Power Commission was given *no authority* over 'the production or gathering of natural gas' " and that the producing states had the power "to protect the interests of those who sell their gas to the interstate operator." *Id.,* at 612–613, 614. (Emphasis supplied.) Five years later, in *Federal Power Commission* v. *Panhandle Eastern Pipe Line Co., supra,* the Court said its approval of the Commission's inclusion of the cost of production and gathering facilities of an interstate pipeline in the latter's rate base "is not a precedent for regulation of any part of production or *marketing.*" 337 U. S., at 506. (Emphasis supplied.)

By today's decision, the Court restricts the phrase "production and gathering" to "the physical activities, facilities, and properties" used in production and gathering. Such a gloss strips the words of their substance. If the Congress so intended, then it left for state regulation only a mass of empty pipe, vacant processing plants and thousands of hollow wells with scarecrow derricks, monuments to this new extension of federal power. It was not so understood. The states have been for over 35 years and are now enforcing regulatory laws covering production and gathering, including *pricing,* proration of gas, ratable taking, unitization of fields, processing of casinghead gas including priority over other gases, well spacing, repressuring, abandonment of wells, marginal area development, and other devices. Everyone is fully aware of the direct relationship of price and conservation. *Federal Power Commission* v. *Panhandle*

*Eastern Pipe Line Co., supra,* at 507. And the power of the states to regulate the producers' and gatherers' prices has been upheld in this Court. *Cities Service Gas Co.* v. *Peerless Oil & Gas Co.,* 340 U. S. 179 (1950); *Phillips Petroleum Co.* v. *Oklahoma,* 340 U. S. 190 (1950). There can be no doubt, as the Commission has found, that federal regulation of production and gathering will collide and substantially interfere with and hinder the enforcement of these state regulatory measures. We cannot square this result with the House Report on this Act which states that the subsequently enacted bill "is so drawn as to complement and in no manner usurp State regulatory authority." H. R. Rep. No. 709, *supra,* at 2.

The majority rely heavily on *Interstate Natural Gas Co.* v. *Federal Power Commission,* 331 U. S. 682 (1947), to support their position. To be sure, there is language in that case which on its face seems to govern the present case. *Id.,* at 692–693. But that case involved a materially different fact situation. The Interstate Gas Company was already subject to Federal Power Commission jurisdiction because of its interstate pipeline operations; and the company was affiliated with one of the pipelines to which it sold. In addition, the Court emphasized the fact that in *Interstate* no claim to state regulatory authority was made. Indeed, the Interstate Company had successfully resisted state attempts to regulate. Hence there was no possibility of conflict in that case; either the Federal Power Commission moved in or Interstate would have remained unregulated. But perhaps a more significant factual distinction in terms of the Court's reasoning in that case rests in the fact that of the total volume of gas Interstate sold, roughly 42% had been purchased from others who had produced *and gathered* it. This 42% was almost enough to supply all the needs of the three interstate pipelines to which Interstate sold. And the 42%,

already gathered and processed, moved into and through Interstate's branch, trunk, and main trunk lines. In short, Interstate was the equivalent of a middleman between gatherers and the pipelines for almost all the gas it sold to the pipelines and performed the function of transporting the gas it purchased from other gatherers through its branch, trunk, and main trunk lines. Phillips performs no such middleman or transmission function. In addition, the late Chief Justice Vinson in that case specifically stated that: "We express no opinion as to the validity of the jurisdictional tests employed by the Commission in these cases [*Columbian* and *Billings, supra*]." 331 U. S., at 690–691, n. 18. Since it was in those cases that the Federal Power Commission established the policy of declining jurisdiction over the rates charged by wholly independent producers and gatherers, it is difficult to see how *Interstate* can control the present case.

If we look to *Interstate* for guidance, we would do better to focus on the following words of the late Chief Justice:

> "Clearly, among the powers thus reserved to the States is the power to regulate the physical production and gathering of natural gas in the interests of conservation or of any other consideration of legitimate local concern. It was the intention of Congress to give the States full freedom in these matters. Thus, where sales, though technically consummated in interstate commerce, are made during the course of production and gathering and are so closely connected with the local incidents of that process as to render rate regulation by the Federal Power Commission inconsistent or a substantial interference with the exercise by the State of its regulatory functions, the jurisdiction of the Federal Power Commission does not attach." 331 U. S., at 690.

Even a cursory examination of Phillips' operations reveals how completely local they are and how incidental to them are its sales to the pipelines. Moreover, federal regulation of these sales means an inevitable clash with a complex of state regulatory action, including minimum pricing. These were matters found by the Federal Power Commission in language obviously patterned after the above quotation. The clear import of the cited words is that Federal Power Commission jurisdiction "does not attach" in such a situation.

In the words of MR. JUSTICE JACKSON, we believe "that observance of good faith with the states requires that we interpret this Act as it was represented at the time they urged its enactment, as its terms read, and as we have, until today, declared it, *viz.*, to supplement but not to supplant state regulation." *Federal Power Commission* v. *East Ohio Gas Co., supra,* at 490.