**NORTHERN NATURAL GAS COMPANY, a Corporation, Plaintiff,**

v.

**SATURN OIL AND GAS COMPANY, Inc., a Corporation, Defendant.**

**Civ. 227L.**

United States District Court
D. Nebraska.
April 2, 1965.

Roach, Grant & McCarthy, and J. C. Osborne and J. B. Will, Omaha, Neb. and Crosby, Pansing & Guenzel and Donn E. Davis, Lincoln, Neb., for plaintiff.

Flavel Wright, Lincoln, Neb., for defendant.

ROBINSON, Chief Judge.

This is an action instituted by Northern Natural Gas Company, a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of Nebraska against Saturn Oil and Gas Company, a corporation organized and existing under the laws of Kansas with its principal place of business in that state. The plaintiff [Northern] is attempting to recover alleged overpayments of purchase price of natural gas purchased from the defendant [Saturn] in the sum of $29,327.51. Saturn has counterclaimed for alleged underpayments of purchase price in an amount in excess of $69,000. Since there is diversity of citizenship and the amount in controversy exceeds $10,000, this Court has jurisdiction by virtue of 28 U.S.C.A. § 1332.

The facts in this case are best set out in chronological order. On December 1, 1951, Northern as buyer and Saturn as seller entered into a written purchase agreement concerning natural gas produced by Saturn from certain wells in the Kansas Hugoton Field. This contract provides that during the five year period commencing January 1, 1952, and ending December 31, 1956, Northern would pay Saturn for all gas purchased under the agreement at a rate of 11¢ per thousand cubic feet [Mcf], measured at a pressure base of 16.4 pounds per square inch absolute [p. s. i. a.]. For the five year period beginning January 1, 1957 and ending December 31, 1961 and for each subsequent five year period, the con-

tract further provides that prices will be renegotiated with arbitration used in case of inability to agree. During any period of disagreement, gas would continue to be supplied at the then effective price with any subsequently agreed upon price to apply retroactively within the period in question.

On December 2, 1953, the Kansas Corporation Commission issued a Minimum Price Order which was to take effect on January 1, 1954. This Order set a price of 11¢ per Mcf at 14.65 p. s. i. a. as a minimum for any gas taken out of the Kansas Hugoton Field. Since the volume of gas varies inversely with the amount of pressure being applied to it, the effect of this Order was to increase the price that Northern was paying Saturn for natural gas.

When the Order went into effect, Northern began stamping a condition of endorsement and acceptance on the backs of the checks which it sent to Saturn. This stamp read as follows:

"Endorsed and accepted subject to conditions of a letter dated February 23, 1954, received by payee from payor pertaining to the wellhead price order of the Kansas Commission dated December 2, 1953."

The letter of February 23, 1954, was basically a protest letter indicating that Northern would pay the increased price out of necessity and in compliance with the law but would expect refund to be made by Saturn for any overpayment resulting from subsequent decision that the Kansas Order was invalid or for any other reason. Identical stamps were placed on all subsequent checks through February of 1955.

On June 7, 1954, the Supreme Court of the United States, in Philips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, held that sales of gas such as the one involved here were subject to the jurisdiction of the Federal Power Commission. In August of 1954, the Federal Power Commission issued Order 174–A which required Saturn and other producers of gas to be sold in interstate commerce to file their rate schedules with the F.P.C. Saturn thereupon filed the contract of December 1, 1951, and the Kansas 11¢ Order.

On April 22, 1955, Northern sent another letter to Saturn requesting proof that Saturn had filed its rates, including the Kansas Order with the F.P.C. The letter reiterated Northern's position with respect to any possible refund by reason of any "payments which may prove to have been erroneously or wrongfully made, either by way of a disallowance of such payments or any part thereof as operating expense in rate proceedings of this Company before the Federal Power Commission or otherwise." Each check sent to Saturn by Northern in payment for gas from March, 1955, to November, 1957, was accompanied by the letter of April 22, 1955 and was also stamped in the same manner explained above. All of the checks during this period of time were accepted and endorsed by Saturn.

On January 1, 1957, the starting date for a new five year period under the 1951 contract, the parties had not yet renegotiated a price nor had arbitration been requested. On or about this time, both parties were interested in certain activities that were going on in the Congress of the United States concerning natural gas producers. Believing that any new price could possibly cause reconsideration of possible legislation that both parties were much interested in, Northern and Saturn entered into a letter agreement on March 27, 1957.

The pertinent two paragraphs of that letter agreement read as follows:

"Inasmuch as the parties have been unable to complete negotiations of the price to be effective January 1, 1957, Seller is agreeable to extending the time for the completion of such negotiations or arbitration and to postpone the commencement date on which a possible change in price shall become effective to a date not later than July 1, 1957; provided, however, that Seller may designate the first day of any month between the date hereof and July 1, 1957,

as the commencement date on which a possible change in price shall become effective by written notice to Northern given not less than 30 days prior to such effective date.

"It shall be understood that during the period from the date hereof until July 1, 1957, or said designated date prior thereto, Northern agrees to pay Seller and Seller agrees to receive prices for gas delivered under said Contract at the rate provided for in Seller's F.P.C. Gas Rate Schedule corresponding with said Contract as now effective or hereafter modified by the Federal Power Commission, which rate at the present time is 11¢ per Mcf at 14.65 psia." 5]

Following this agreement, Northern continued to stamp its checks as before and Saturn continued to accept and endorse them.

On January 20, 1958, the Supreme Court of the United States held that the Kansas 11¢ Order was void *ab initio* since it was in conflict with federal legislation in the field. Cities Service Gas Company v. State Corporation Commission of Kansas, 355 U.S. 391, 78 S.Ct. 381, 2 L.Ed.2d 355. By letters of January 24 and February 24, 1958, Northern repeated its protest of payments at the Kansas 11¢ Order level while waiting for the issuance of the Mandate in the Cities Service case.

By letter of March 24, 1958, Northern informed Saturn that payments for gas purchased in February, 1958, and thereafter would be made at the price stipulated in the contract of 1951, or 11¢ per Mcf at 16.4 pounds p. s. i. a.

On July 31, 1958, Northern wrote another letter to Saturn demanding a refund of $29,327.51. This amount is the difference between payments made under the Kansas 11¢ Order between January, 1954, and January, 1958, and the amount that would have been paid under the 1951 contract for that same period of time. On August 14, 1958, Saturn refused Northern's demand and demanded that Northern resume paying for gas

at the price indicated in the Kansas 11¢ Order.

Saturn has now counterclaimed for $69,074.10 which is the difference between [1] the amount that would have been paid during the period from February, 1958, to August 31, 1964, under the Kansas 11¢ Order and [2] amounts actually paid by Northern at a price of 11¢ per Mcf at 16.4 pounds p. s. i. a.

Saturn has admitted that it owes Northern $20,628.18 for overpayments made for the period beginning January 1, 1954, and ending January 1, 1957. Saturn, however, denied liability for any payments made after January 1, 1957, and has, of course, counterclaimed for alleged underpayments beginning in February of 1958.

Although the parties have proposed two or three theories that they believe to be controlling, closer examination of the record indicates that the basic and fundamental problem involved here arises from the interpretation of the contract of March 27, 1957. Saturn contends that this agreement sets the new price to be paid for gas under the 1951 contract at the level of the Kansas 11¢ Order—in effect a ratification of that Order and inclusion by agreement into the 1951 contract of that Order. Northern contends that this letter is merely an agreement postponing the effective date of any new price arrangements and that the paragraph relating to price in the interim is nothing more nor less than a reiteration of the price situation as it existed on March 27, 1957—payments being made under protest at the level of the Kansas 11¢ Order.

Although the second of the two paragraphs set out above [referring to price to be paid in the interim] is admittedly somewhat less than clear and concise, we must agree with Northern in its interpretation thereof, especially in light of the surrounding circumstances both before and after the agreement was entered into. We think it is clear from the testimony that the main purpose for arranging the agreement was to postpone the effective date of any new price.

Both parties wanted to avoid any repercussions that might affect the activities going on in Congress.

The price to be paid was "at the rate provided for in Seller's F.P.C. Gas Rate Schedule *corresponding with said Contract* as now effective or hereafter modified by the Federal Power Commission. [emphasis supplied]" The parties knew that the Kansas 11¢ Order was being contested and that Northern expected a refund if the Order were to be ruled void, ab initio, as it subsequently was. The effective date under file then was one that was only effective if the Kansas Order were declared valid. All of the correspondence between the parties indicates that they understood this to be the case. "As now effective" can only be reasonably construed under these circumstances to include the contingent factor of possible invalidity of the Kansas 11¢ Order.

In addition to this, the rate to be charged was according to the filed schedule in accordance and corresponding with the contract of December 1, 1951. Had the parties meant that the effective price was to be the level of the Kansas Order this could have been simply stated without mentioning the contract in relation to price. They did mention the contract and this must have been done for a reason. We find that this reason was to continue the price relationship in the same position it was presently in, i. e., the Kansas Order was presently effective subject to protest and possible refund.

Every indication in the record points to this understanding on the part of both parties. Northern had been constantly protesting and informing Saturn that they would expect a refund if the Kansas Order was held invalid. This they continued to do after the March 27 agreement. If Saturn did not have the same understanding that Northern did, something should have been said at that time. Saturn's silence is not well explained by the statement that the conditions of endorsement that continued to be stamped on the Northern checks were mere clerical mistakes. Most actions such as that are done for a reason and it doesn't do to blithely disregard such a warning.

In short, then, we find that the agreement of March 27, 1957 was basically aimed at extending the time of the first five year period under the December 1, 1951 contract. We have no doubt that Saturn expected the Kansas 11¢ Order to be sustained and that it would have been happy to continue selling at that price. The agreement made between the parties is not, however, that for which Saturn is now contending.

We are quick to acknowledge that the agreement in question is ambiguous in its wording. It would not, in fact, be unreasonable to construe it in the manner for which Saturn contends were it standing alone. But given the ambiguity and the surrounding circumstances which lend a helping hand toward giving the words their proper meaning, we must find that the agreement should be construed as we have outlined above.

So also the oral agreements that have been adequately established in the record must be declared to be binding. Thus the contract is presently at a point where until either party initiates a renegotiation of price, it will continue as it stands. The effective starting date of any new price will be the time when either party sets in motion the machinery as provided in the March 27, 1957, agreement. Since the parties have both partly performed and the contract could have been performed within a year, the Statute of Frauds has no effect on this oral agreement. Powder River Live-Stock Co. v. Lamb, 38 Neb. 339, 56 N.W. 1019.

Another problem that presents itself concerns the necessity of filing the March 27, 1957 letter agreement with the Federal Power Commission. As already mentioned, Saturn was required to file its rate schedule with the F.P.C. Order 174–B which superseded Order 174–A of the F.P.C. and which remains a part of the regulations of the F.P.C. provides in part as follows:

" § 154.93 *Rate Schedule Defined.*
—For the purpose of Sections 154.92

through 154.01 hereof "Rate Schedule" shall mean the basic contract and all supplements or agreements amendatory thereof,—"

In Sunray Mid-Continent Oil Company v. Federal Power Commission, 290 F.2d 552 at page 555 [10th Cir., 1961] the Court made the following statement:

"Sec. 4[d] of the Natural Gas Act requires natural gas companies to file with the Commission all contract changes regardless of whether such changes affect the rate level or whether they do not. The basic contract together with amendments is the rate schedule which at all times must be available for Commission use and public inspection."

■ · Saturn contends that since the agreement did not change any of the existing rate schedules, there was no reason to file the agreement. We believe that this thought misconstrues the wording and intention of the regulations of the Commission. Any supplement or amendment to the contract already on file must also be filed. The March 27 agreement was certainly an amendment to the 1951 contract. It extended the time for effective application of any renegotiated price. This can be interpreted no other way than as a change in the terms of that contract.

But it may be argued that no rate was changed, so the agreement was at least effective insofar as price is concerned. This would entirely overlook the fact that in January of 1958, the Supreme Court of the United States declared the Kansas 11¢ Order invalid. At that time, the only effective rate that could be found on file with the F.P.C., was that found in the 1951 contract. There was nothing in the Commission files to indicate that any agreement was made on March 27, 1957. Since the Kansas Order was declared invalid ab initio, the only effective

filing for the entire period from 1954 to 1958 was the contract of December 1, 1951. We thus cannot accept the argument that the agreement of March 1957, even if it had been the type of agreement which Saturn contended, could have had any effect on the rate being charged by Saturn. It should have been filed. It was not filed and the result is obvious. The only rate that can be charged by a producer under the jurisdiction of the F.P.C. is the effective rate on file. McClellan v. Montana-Dakota Utilities Co., [D.C.Minn., 1952] 104 F.Supp. 46, affirmed 204 F.2d 166, certiorari denied, 346 U.S. 825, 74 S.Ct. 43, 98 L.Ed. 350.

We of course do not find any bad faith on the part of Saturn in not filing. But the fact remains that if the defendant wanted to give any effect to the agreement of March 27, it should have filed the same with the F.P.C. This is especially true after the decision invalidating the Kansas Order. Then there was no valid price on file which reflected the agreement and it should have been clear at that time that the agreement would have to be filed.

So we can see that Saturn is foreclosed from recovering on its counterclaim both by our interpretation of the words of the March 1957 agreement and by the failure to file the agreement even if it had corresponded with Saturn's contentions.

We can find no compelling reason to entertain any of the other theories espoused by the parties in view of the foregoing. Northern shall be granted the relief requested and the counterclaim of Saturn will be dismissed with prejudice.

The foregoing shall constitute findings of fact and conclusions of law in accordance with Rule 52[a] of the Federal Rules of Civil Procedure. Counsel for the plaintiff will prepare and submit an appropriate order of judgment within fifteen [15] days.