513 F.2d 395
 10 ERC 1732, 168 U.S.App.D.C. 137, 6
Envtl. L. Rep. 20,508
 Alice HENRY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Continental Oil Company et al., Intervenors.
ENVIRONMENTAL DEFENSE FUND, INC., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent,
Public Service Commission of the State of New York et al., Intervenors.
PEOPLE OF the STATE OF CALIFORNIA and the Public Utilities
Commission of theState of California, Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent,
Columbia Coal Gasification Corporation et al., Intervenors.
TRANSWESTERN COAL GASIFICATION COMPANY et al., Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Continental Oil Company et al., Intervenors.
 Nos. 73-2090, 73-2166, 73-2236, 74-1045.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Nov. 25, 1974.
Decided July 28, 1975.
 
 James W. McCartney, Houston, Tex., with whom C. Michael Harrington, Houston, Tex., and K. R. Edsall, Los Angeles, Cal., were on the brief for petitioner in No. 74-1045 and intervenor Transwestern Coal Gas Co. in Nos. 73-2096, 73-2166 & 73-2236.
 William H. Booth, Berkeley, Cal., with whom John P. Mathis and J. Calvin Simpson, San Francisco, Cal., were on the brief for petitioner in No. 73-2336. Also Lawrence Q. Garcia, San Francisco, Cal., entered an appearance in No. 73-2236.
 Clifton E. Curtis, Washington, D. C., with whom Edward Berlin, Washington, D. C., was on the brief for petitioner in No. 73-2166.
 Richard A. Oliver, Atty., Federal Power Commission, with whom Leo E. Forquer, Gen. Counsel and George W. McHenry, Jr., Sol., Washington, D. C., were on the brief for respondent.
 
 
 1
 William A. Wood, Jr., Houston, Tex., with whom Thomas G. Johnson and William G. Riddock, Houston, Tex., were on the brief for intervenor, Shell Oil Co.
 
 
 2
 Kirk W. Weinert and C. Fielding Early, Jr., Houston, Tex., were on the brief for intervenor, Texaco Inc., also John N. Young, Houston, Tex., entered an appearance for Texaco.
 
 
 3
 William J. Bonner, Dallas, Tex., was on the brief for intervenor, Atlantic Richfield Co.
 
 
 4
 John L. Williford and Charles Larry Pain, Bartlesville, Okl., were on the brief for intervenor, Phillips Petroleum Co., Kenneth Heady, Bartlesville, Okl., also entered an appearance for intervenor Phillips Petroleum.
 
 
 5
 Martin N. Erck and John H. Cooper, Jr., Houston, Tex., were on the brief for intervenor Exxon Corp. Also John R. Rebman and Paul W. Wright, Houston, Tex., entered appearances for intervenor, Exxon Corp.
 
 
 6
 Penn J. Williamson, Birmingham, Ala., was on the brief for intervenor, Southern Natural Gas Co.
 
 
 7
 Richard A. Rosan and John F. Sisson, Wilmington, Del, were on the brief for intervenor, Columbia Coal Gasification Corp.
 
 
 8
 Richard W. Hughes and Robert M. Strumor, Shiprock, N. M., were on the brief for petitioner in No. 73-2090.
 
 
 9
 Clifton E. Curtis and Edward Berlin, Washington, D. C., were on the brief for petitioner in No. 73-2166.
 
 
 10
 Tom Burton, Houston, Tex., also entered an appearance as intervenor, Continental Oil Co.
 
 
 11
 Richard A. Solomon, Peter H. Schiff and Michael H. Rosenbloom, Washington, D. C., entered appearances for intervenor, Public Service Commission for the State of New York.
 
 
 12
 Daniel L. Bell, Jr., Charleston, West Va., was on the brief for intervenor Columbia Gas Transmission Corp.
 
 
 13
 Graydon D. Luthey, Tulsa, Okl., was on the brief for Cities Service Gas Co.
 
 
 14
 Before LEVENTHAL and WILKEY, Circuit Judges, and RICHEY,* United States District Court Judge, for the District of Columbia.
 
 
 15
 Opinion for the Court filed by Circuit Judge LEVENTHAL.
 
 LEVENTHAL, Circuit Judge:
 
 16
 This case raises the question of whether the jurisdiction of the Federal Power Commission (FPC) under the Natural Gas Act (Act), 15 U.S.C. § 717 et seq. (1970), extends to the production, transportation, and sale of unmixed synthetic gas produced from coal. The Commission has ruled that it has no jurisdiction over this kind of gas, on the ground that it is "artificial" within the meaning of § 2(5) of the Act, 15 U.S.C. § 717a(5) (1970). This determination is challenged by the State of California and the Public Utilities Commission of California; the Environmental Defense Fund (EDF); the Transwestern Group,[1] which plans to produce and sell gas from coal feedstock; Transwestern Pipeline Co.; and certain individuals. We affirm the Commission's ruling.
 
 I. THE FACTUAL BACKGROUND
 
 17
 The current shortage of natural gas has, one might say, energized the search for alternative natural and synthetic sources. The manufacture of gas from coal and other feedstocks is not a recent innovation.[2] However, large-scale production of high-Btu gas from coal feedstocks has only recently become a viable possibility. The basic coal gasification method (the Lurgi Process), which involves the reaction of coal with steam and oxygen to form gas with a heat content of approximately 415 Btu per cubic foot, has been used for years. The low-Btu gas that it produces can now be converted through methanation, in which the carbon monoxide and hydrogen components of the gas are reacted in the presence of a catalyst, into gas that has a heat content of approximately 972 Btu per cubic foot.
 
 
 18
 This proceeding involves two projects that are to be the first facilities to produce high-Btu gas from coal for interstate transportation. The plants are to be built in New Mexico on a Navajo Indian reservation, and the feedstock will be taken from adjacent strip mines.
 
 
 19
 The case came before the Commission on three applications, filed pursuant to § 7(c), of the Act, 15 U.S.C. § 717f(c) (1970), for certificates of public convenience and necessity. El Paso Natural Gas Company filed for authorization to construct and operate tap and valve facilities for the introduction of gas from coal into its New Mexico mainline, where it is to be commingled with gas from wells. The Transwestern Group applied for a certificate authorizing the construction and operation of facilities to convert coal to gas, and the sale for resale of the product to Transwestern Pipeline Co.; Transwestern Pipeline applied for authorization for the construction and operation of a pipeline to transport the purchased gas from the plant to the pipeline's main system, and the transportation and sale of the commingled stream.[3]
 
 
 20
 El Paso asserted that the Commission has jurisdiction over the coal gas only after it is commingled in the mainline system, and Transwestern asserted that the Commission's jurisdiction extends as well to the production, sale, and transportation of the unmixed coal gas. The proceedings were consolidated for purposes of deciding the jurisdictional questions.
 
 
 21
 Prior to consolidation, Petitioner EDF had asked for leave to intervene in the El Paso proceeding. In the consolidated proceeding, EDF contended that the FPC has full jurisdiction over the unmixed coal gas, and that the Commission is required in any case to consider the environmental consequences of El Paso's upstream facilities in passing on its application for certification of the tap and valve facilities.
 
 
 22
 The Commission, in Opinion No. 663,[4] held that gas produced from coal feedstock is not "natural gas" within the meaning of § 2(5), and that, consequently, it has no jurisdiction over the production, sale, or transportation of such gas prior to its mixture with gas from wells. The Transwestern Group's application and those portions of Transwestern Pipeline's application pertaining to unmingled coal gas were dismissed.[5] The Commission further said, in response to EDF's contention, that it is required to consider only those environmental consequences ascribable to jurisdictional activities, and that the need for an environmental impact statement thus turns on the question of whether the tap and valve facility is a major federal action having a significant effect on the human environment, an issue which was deferred pending a staff investigation.[6]
 
 
 23
 II. THE JURISDICTION OF THE FPC OVER GAS MANUFACTURED FROM COAL
 
 A. The Language of § 2(5)
 
 24
 The reach of the Natural Gas Act is defined in § 1(b), 15 U.S.C. § 717(b) (1970):
 
 
 25
 The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation and sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.
 
 
 26
 "Natural gas" is defined in § 2(5) as "either natural gas unmixed, or any mixture of natural and artificial gas."
 
 
 27
 This is clear and unambiguous language. We have said, in a similar context, that "as a point of departure we may properly begin with the presumption that Congress, like other legislatures, has in mind the ordinary, usual and natural sense of a word. . . ."[7] An ordinary reading of the statute which draws a distinction between "natural" and "artificial" gas requires us to look to the origin of the gas, not to its physical characteristics. The FPC took this approach, looking to whether the gas in question is manufactured,[8] rather than to its heat value or methane content.[9]
 
 B. The Legislative History
 
 28
 Petitioners contend that, in enacting the Natural Gas Act, Congress was concerned with the interstate character of the market, rather than with the origin of the regulated product. The desire to fill the regulatory gap left by judicial decisions prohibiting the state regulation of interstate commerce aspects of the natural gas market has been described by the Supreme Court in Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 682, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), as "the overriding congressional purpose" in enacting the Act. But Congress chose to impose the new Federal regulatory structure on the interstate Natural gas market. If it had wished to draw the jurisdictional line between gas, from whatever source, that had a high heat content and could profitably be transported long distances through high-pressure lines, and low-Btu gas that could not be profitably transported outside the local area, it could have done so expressly. Several early bills, precursors of the Act, would have given the Commission jurisdiction over the transportation of gas through high-pressure, as opposed to low-pressure, mains.[10] However, even these bills purported to reach only the transmission of natural gas.
 
 
 29
 Despite the clearly implicit exclusion of artificial gas in § 2(5), Petitioners contend that we should take an expansive view of the Commission's jurisdiction because Congress could not have foreseen the production of synthetic gas that could be transported interstate with the ease that El Paso and Transwestern contemplate. However, the legislative history indicates that Congress was aware that the expansion of the synthetic gas industry into interstate commerce was a potential, and perhaps even probable future development. In hearings on H.R. 11662[11] a precursor of the bill that became the Natural Gas Act the National Association of Railroad and Utilities Commissioners (NARUC) proposed that the word "natural" be deleted throughout the bill and that an amendment be added to define "gas" as "either natural gas or artificial gas or any mixture of natural and artificial gas."[12] John E. Benton, the General Solicitor of NARUC, said that the Association was concerned that pipeline companies would attempt to avoid FPC jurisdiction by injecting a small amount of artificial gas into their natural gas lines, and that artificial gas unmixed with natural gas would escape the Commission's jurisdiction altogether. Benton explained the Association's position.
 
 
 30
 . . . if, As the probabilities are, the production of artificial gas shall increase, and it shall be supplied at wholesale across State lines to distributing companies, to a much greater extent than at present, the Commission will be vested with adequate powers to deal with all cases which may arise.[13]
 
 
 31
 The potential for the manufacture of one kind of high-Btu gas was described by Floyd C. Brown, Vice President and General Manager of Natural Gas Pipeline Company of America, and Texoma Natural Gas Co., in some detail:
 
 
 32
 In recent years a process has been developed for the manufacturing of a high B. t. u. gas which is a fair substitute for natural gas. The gravity and the B. t. u. value of this gas can be made almost what the operators desire. Many of the gas plants are being worked over and converted so that they can make oil-gas as a substitute for natural gas and to help take off some of the peak loads when the pipe line is unable to supply the full requirement.[14]
 
 
 33
 In the next session of Congress, H.R. 4008, 75th Cong., 1st Sess. (1937), was introduced. In the form of H.R. 6586, as amended, this bill became the Natural Gas Act of 1938. This time Mr. Benton proposed, and the committee accepted, the addition to H.R. 4008 of a section that contained language substantially the same as that now found in § 2(5) that " 'Natural gas' shall be construed to mean either natural gas unmixed, or any mixture of natural gas and artificial gas."[15] It is responsive to one of NARUC's original concerns, that regulation not be evaded by mixing artificial with natural gas, but it makes no attempt to regulate unmixed artificial gas, although that was attempted in the amendment proposed in the previous session by the same state regulatory group, and although the possibility of interstate transmission of artificial gas (at high pressure) had been recognized as a development within industry's technical capacity.
 
 
 34
 Congress' decision not to extend the FPC's jurisdiction to unmixed artificial gas appears to have been based in large part on its assumption that there was no present likelihood that substantial quantities of such gas would be shipped interstate. In the Senate debates on H.R. 6586, the limited reach of the Act was directly linked to the insubstantiality of interstate transportation of artificial gas:
 
 
 35
 Mr. CONNALLY. . . .
 
 
 36
 Is the bill confined to natural gas?
 
 
 37
 Mr. WHEELER. It is confined to natural gas.
 
 
 38
 Mr. CONNALLY. Why should it not apply to every kind of gas?
 
 
 39
 Mr. WHEELER. Because manufactured gas is not transported.
 
 
 40
 Mr. CONNALLY. But it can be transported.
 
 
 41
 Mr. WHEELER. It cannot be profitably transported. . . . The only kind of gas that can be profitably shipped in interstate commerce is natural gas.[16]
 
 
 42
 This legislative history gives fair indication that Congress had been made aware of the potential of interstate transmission of artificial gas, but had decided to defer that matter for resolution when the technical future might become an economic reality, rather than deal with it hypothetically. There is nothing to indicate that the Act was intended to become applicable automatically, without further Congressional determination, some time in the future as it happens, almost 40 years later when large-scale interstate transportation of manufactured gas should become both a technical and economic reality. Not infrequently the courts rightly ascertain a comprehensive legislative intention in a statute that extends scope and jurisdiction to technical developments not known at the time of passage. See United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). But the extension is not automatic. The decision depends on the history, purpose and mood of the statute.
 
 
 43
 The Supreme Court has recently reiterated, in Chemehuevi Tribe of Indians v. FPC, --- U.S. ---, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975), that technological developments do not in themselves justify an expansion of the jurisdiction of an agency beyond the scope described by Congress. In that case, the Supreme Court refused to read Part I of the Federal Power Act to give the FPC licensing jurisdiction over thermal-electric, as well as hydroelectric, power facilities, even though the former could be said to fall within the literal jurisdictional language of the statute. The Court said that, although the legislative history of an act may reveal "an ambitious attempt by Congress to provide for comprehensive control" over a given area (in that case, the development of water power), the act cannot be extended, in the absence of any suggestion in the legislative history, to similar and related areas (such as steam power).[17] Complainants in that case urged that the Court's construction "does great violence to the policies central to the Federal Power Act in the light of modern conditions."[18] The Court replied that "(w)hatever the merits of the complainants' argument as a matter of policy, it is properly addressed to Congress, not to the courts."[19] We give a similar response in the case at hand, especially when the legislative history shows, as it does, that the technological development was not a bolt from the blue but was rather a matter that was foreglimpsed and left for the Congress of a later day.
 
 
 44
 C. The Objective of Avoiding a Regulatory Gap Does Not By Itself Suffice to Establish Direct Jurisdiction
 
 
 45
 Citing FPC v. Louisiana Power & Light Co., 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972), Petitioners argue that, despite the clear language of the statute, the Natural Gas Act is to be interpreted expansively to fill all "gaps" in regulation to the end that "private interests (not) subvert the public welfare." 406 U.S. at 631, 92 S.Ct. at 1833. They argue that the FPC cannot adequately protect gas consumers in the absence of direct jurisdiction over synthetic, as well as natural, gas.
 
 
 46
 The need for regulation cannot, of its own force, expand the reach of Commission jurisdiction. FPC v. Louisiana Power & Light Co., Supra, 406 U.S. at 635-36, 92 S.Ct. 1827.[20] Where a claimed jurisdiction cannot be reconciled with the words of the statute as ordinarily used and as likely to have been understood by Congress,
 
 
 47
 (w)e do not think a different result warranted or mandated on the ground that the purpose of the Act is to protect the ultimate beneficiaries against exploitation by natural gas companies. That was indeed the objective of Congress . . . The FPC is to be commended for attempting to further that objective, but it is not sufficient justification upon which to base an expansion of the Act to activities clearly not within its terms. Congress did not give the FPC carte blanche to take whatever action it might consider appropriate in furtherance of this purpose.
 
 
 48
 Mobil Oil Corp. v. FPC, 149 U.S.App.D.C. 310, 317, 463 F.2d 256, 263 (1971), cert. denied, 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676 (1972).[21]
 
 
 49
 As the FPC observed, Petitioners seek an expansion of the scope of the Act to a distinctly new subject, rather than a filling of its interstices in order to ensure effective regulation of admittedly jurisdictional areas as the Court required it to do in, for instance, Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), and United Gas Improvement Co. v. Continental Oil Co., 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466 (1965).[22] In Mobil Oil Corp.v. FPC, 149 U.S.App.D.C. 310, 463 F.2d 256, cert. denied, 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676 (1972), we declined an invitation to hold in the face of the common understanding of the statutory language and all other indicia of Congressional intent that royalty provisions of oil and gas leases which provided for retention of a percentage interest in gas sold constitute sales for resale within the meaning of the Act. We think it appropriate to apply that approach to this case.
 
 
 50
 D. Protection of Overall Public Interest When Considering Certificate for Jurisdictional Facilities
 
 
 51
 Fortunately, this jurisdictional ruling does not leave the FPC completely devoid of authority to protect consumers from inflated synthetic gas prices and supply instability. The Commission does have jurisdiction over the interstate transportation and sale for resale of mixed synthetic and natural gas.
 
 
 52
 In reviewing applications for certification under § 7 for, say, tap and valve facilities to introduce gas from coal into natural gas pipelines, the FPC is required to scrutinize all factors bearing on the public convenience and necessity and is authorized to impose those conditions that may be required to protect consumers.
 
 
 53
 The breadth of the Commission's power and responsibility in reviewing applications for certification under § 7(e) of the Act is sketched in Atlantic Refining Co. v. Public Service Comm'n, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959), the CATCO case. The Court held that the FPC could not issue an unconditioned § 7 certificate for the sale of natural gas where the rate was not shown to be required by the public convenience and necessity. In order to ensure that the Act affords the consumers "a complete, permanent and effective bond of protection from excessive rates and charges," 360 U.S. at 388, 79 S.Ct. at 1253, the Commission is authorized in fact is affirmatively required to give "a most careful scrutiny and responsible reaction to initial . . . proposals of producers under § 7," and has discretion to "attach such conditions as it believes necessary." 360 U.S. at 391, 79 S.Ct. at 1255. The responsible exercise of this authority was found to be particularly important where "the initial price will set a pattern in an area. . . . (and) in effect become the floor for future contracts . . ." 360 U.S. at 390, 79 S.Ct. at 1254.
 
 
 54
 Of particular and almost paramount significance for the subject under discussion is FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961), where the Court expressly held that the Commission's power under § 7 to consider matters of the public interest when deciding whether to issue a certificate for jurisdictional facilities extends generally to a consideration of "All factors bearing on the public interest,"[23] and specifically extends to matters that are excluded from the direct regulatory jurisdiction of the Commission. That case involved an application for the certification of the transportation by an interstate pipeline of gas to be sold directly by a Texas producer to a New York purchaser for use under boilers for the production of steam. The Court held that § 7(e) of the Act embraces FPC consideration, when passing on an application for certification, first, of the end use of the gas to be transported and its possible preemption of reserves to the detriment of domestic consumers though the FPC has neither general allocation authority nor jurisdiction to regulate direct sales to industrial consumers once the facilities are certificated; and second, of the prospect that the high price of the sale would be an upward lever on natural gas prices in general even though the Commission had no jurisdiction over the underlying sale or any authority to regulate its price.
 
 
 55
 Although Justice Harlan, joined by Justices Frankfurter and Stewart, dissented from another feature of the decision, he joined in the ruling now under discussion, and indeed put the matter so succinctly as to merit quotation. See 365 U.S. at 36-37, 81 S.Ct. at 453-454 (footnotes omitted):
 
 
 56
 Basically, I think it was open to the Commission to decide whether the particular transportation service before it would tend to waste gas, unduly preempt pipeline capacity, or raise field prices. I think the Commission can properly assert this more limited power as an incident of its transportation certificating powers. It is quite true of course that Consolidated Edison need not have resorted to the Federal Power Commission if the purchase transaction had been possible without the interstate transportation of the gas in jurisdictional pipelines, since this was not a purchase of natural gas for resale. . . .
 
 
 57
 However, it does not follow that the Commission had to bind itself to the effects of the purchase and use of the gas when its authority to certificate the transportation of the gas was invoked. To recognize that the transaction was, as a practical matter, impossible without the use of jurisdictional facilities for the interstate transportation of the purchased gas is to acknowledge that this transportation is as integral a part of the transaction as was the sale itself. Whether the adverse effect of the transaction be a waste of a scarce resource, or pre-emption of pipeline capacity, or a substantial boosting of field prices, The transportation is as responsible for the effects as is the original sale. I see no reason why the Commission must certify, as in accord with the "public convenience and necessity," transportation which tends materially to further such undesirable results which are within the area of the Commission's legitimate concern when it is considering the public convenience and necessity of certificating a jurisdictional sale.
 
 
 58
 (Emphasis added.)
 
 
 59
 Similarly, in the case before us, if the sale and transportation of synthetic gas is impossible without the use of jurisdictional facilities for the jurisdictional transport of mixed gas, that jurisdictional use and transfer "is (an) integral . . . part of the transaction" and "responsible for the effects" of the project.
 
 
 60
 An attentive study of Transcontinental warrants Judge Van Pelt's reference to this, and other opinions, as identifying the Federal Power Commission's "effective indirect control over concededly non-jurisdictional transactions and facilities." Panhandle Eastern Pipe Line Co. v. FPC, 359 F.2d 675, 683 (8th Cir. 1966). In that case, the court sustained the FPC's exercise of jurisdiction over natural gas bearing helium though it had no jurisdiction over helium, and the exercise of jurisdiction over its transportation to a helium extraction plant, though involving transportation "to a non-jurisdictional facility (for) a non-jurisdictional sale."
 
 
 61
 In its opinion under review the Commission expressed its intent to consider end use and cost of gas in passing on applications for certificates concerning the commingled gas.[24] In an earlier case, Algonquin SNG, Inc., 48 FPC 1216 (1972), where it held that it lacked jurisdiction over gas produced from naphtha feedstock, the Commission, in authorizing Algonquin Gas (the purchasing pipeline) to make the necessary interconnections and to transport and sell for resale naphtha gas mixed with natural gas, imposed several conditions designed to protect the public from escalating prices. An appeal from the Transco decision to our court was mooted.[25] In P 41 of Opinion No. 663,[26] the Commission asserted that it can consider imposing similar conditions on certifications concerning mixtures of natural gas and coal. We do not have before us any concrete issue as to whether the FPC might contemplate going too far, or not far enough, in considering such § 7 applications. It suffices for present purposes to say that the Supreme Court decisions already discussed make clear that the Commission's jurisdiction must be given a spacious and not a crabbed reading, and that the Commission's jurisdiction over Transwestern's and El Paso's tap and valve facilities as well as over the transportation and sale for resale of mixed gas gives it a corollary authority and responsibility to look into "All factors bearing on the public interest" (See note 23 Supra ).
 
 
 62
 The FPC's broad power to condition certificates provides mechanisms that should be sufficient to enable it to protect the natural gas public from the impact of disproportionate prices. If the Commission does not feel that they will be adequate in a particular case, it can refuse to certify a proposal dependent on a mixture of synthetic with natural gas on the ground that it is not in the public interest,[27] that it in effect contaminates the dedication of natural gas in interstate commerce to service of the public interest.
 
 
 63
 If gas produced from coal is never mingled with natural gas for transport or sale, it will completely escape Commission regulation. This possibility seems unlikely given the great cost of constructing separate and parallel pipeline systems, not to mention the current excess capacity attributable to supply shortages. However, if substantial interstate commerce in pure coal gas does come to exist, Congress will have to decide whether, to what extent, and by which agency, if any, it should be regulated.[28]
 
 
 64
 III. THE RESPONSIBILITY OF THE FPC TO ASSESS THE
 
 ENVIRONMENTAL CONSEQUENCES OF THE GASIFICATION
 PROJECT AS A WHOLE
 
 65
 Petitioner EDF contends that, even if the FPC's jurisdiction does not extend to the production and transportation of unmixed coal gas, it is required, by the National Environmental Policy Act of 1969 (NEPA),[29] to consider the environmental consequences of these activities in deciding whether to issue a certificate to El Paso authorizing the construction of tap and valve facilities. The FPC responds that that question is not properly before this court because Opinion No. 663 reserved the issue of the environmental impact of jurisdictional facilities for further staff review, and said that the issue raised by EDF was premature.[30]
 
 
 66
 We affirm the ruling of the FPC, although we differ in our reasoning as to why the matter is premature at the present time. The Commission's conclusion that the question of its responsibility under NEPA was premature was based on the premise that its role under that Act is limited in this case to the evaluation of the incremental impact on the environment of the jurisdictional tap and valve facility, even if the coal gasification project of which that facility is an essential part constitutes a major federal action having a significant effect on the environment.[31] We think that the Commission takes too narrow a view of its responsibilities under NEPA.
 
 
 67
 The mobilization of the gasification complex requires the approval of several federal agencies in addition to the FPC the Bureau of Reclamation of the Department of the Interior controls the relevant water rights; the Army Corps of Engineers and the Secretary of the Army must approve any structures that will divert river water; the U.S. Geological Survey has authority over the mining development plan; and the Area Director of the Bureau of Indian Affairs must pass on any coal and business leases negotiated with the Navajo Tribe. The Bureau of Reclamation has been designated as "lead agency" to prepare a draft environmental impact statement for the entire gasification project.[32]
 
 
 68
 NEPA requires an integrated view of the environmental damage that may be caused by a situation, broadly considered, and its purpose is not to be frustrated by an approach that would defeat a comprehensive and integrated consideration by reason of the fact that particular officers and agencies have particular occasions for and limits on their exercise of jurisdiction. See Natural Resources Defense Council (NRDC) v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972) (holding that NEPA requires that the environmental impact statement discuss all alternatives reasonably available, including those beyond the jurisdiction of the agency to adopt); 40 C.F.R. § 1500.6(d) (1974) (Council on Environmental Quality interpretive guidelines requiring impact statements to consider secondary, indirect, and cumulative effects of federal actions).
 
 
 69
 As NRDC v. Morton, Supra, points out, this integration of environmental consideration is consistent with a "lead agency" concept under which one agency, normally that which is first in time, will have responsibility for preparing the comprehensive impact statement. In the case at bar, that agency is the Bureau of Reclamation. Its environmental impact statement will have to provide an overview of total environmental damage in order to comply with NEPA.
 
 
 70
 If we understand the FPC's reasoning aright, it is of the view that while the lead agency will prepare a comprehensive environmental impact statement under NEPA, when the FPC comes to consider the § 7 application for tap and valve facilities, it need only consider part of the environmental damage (the incremental damage from the tap and valve facilities) and hence need only consider part of the impact statement. That approach, in this court's view, is inconsistent with the FPC's obligation, both under NEPA and under the Natural Gas Act (under the CATCO and Transcontinental opinions).
 
 
 71
 The FPC's concern in, say, a § 7 proceeding to certify the critical interconnection facilities, will encompass an evaluation of All the elements of the gasification project. The burden of environmental damage from that overall project is an important part of this total evaluation.[33]
 
 
 72
 The reason why the issue raised by EDF is premature at the present time is simply that the FPC is not necessarily required to prepare a full environmental impact statement for the gasification project. It can rely on the statement prepared by the lead agency. What is required is that the FPC, in deciding whether to grant, deny or condition certificates of public convenience and necessity for admittedly jurisdictional facilities, take into account the environmental costs of the gasification projects as a whole. It may do this by accepting, rejecting, or modifying the analysis of the lead agency. There may be matters as to which it has particular expertise, and corresponding reactions of analysis. But all that is timely at present is the issue of the preparation of an environmental impact statement, and since this is not necessarily the obligation of FPC, we do not remand Opinion No. 663. There may be complaint, after the environmental impact statement is prepared, that the FPC has unlawfully ignored or disregarded environmental matters in its § 7 ruling. That will be subject to review when the particular certification orders are entered.
 
 
 73
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a)
 
 
 [1]
 "Transwestern Group" is our appellation for Petitioners Transwestern Coal Gasification Company, Pacific Coal Gasification Company, and Western Gasification Company
 
 
 [2]
 In 1936, a year when hearings on the Act were underway, more than 238 Mcf of low-Btu artificial gas was produced, primarily for local markets. See Algonquin SNG, Inc., 48 FPC 1216, 1220 (1972)
 
 
 [3]
 El Paso proposes to buy synthetic gas produced by a subsidiary and transport it in a pure state to its mainline system, where it will be introduced into the main pipeline through the interconnection facilities for which certification is sought. Transwestern proposed a similar system whereby gas manufactured from coal by Transwestern Coal Gasification Company, Pacific Coal Gasification Company, and Western Gasification Company was to be sold to Transwestern Pipeline for resale elsewhere. After the issuance of the FPC's opinion in this case, Transwestern modified its application to provide that Transwestern Pipeline not take title, but merely transport the gas for sale directly to its principal customers, Pacific Lighting Service Co. and Cities Service Gas Co. The synthetic gas is to be mixed with natural gas in the pipelines prior to sale and the Commission has asserted jurisdiction over the sale of this mixed gas. Transwestern Coal Gasification Co., FPC Opinion No. 728 (April 21, 1975)
 
 
 [4]
 50 FPC 651 (1973)
 
 
 [5]
 In Transwestern Coal Gasification Co., Supra note 3, the FPC issued certificates authorizing the direct sale of synthetic gas to Pacific Lighting and Cities Service, as well as the transportation of the gas by Transwestern Pipeline. A motion to defer decision on El Paso's application was granted by unpublished order on April 21, 1975
 
 
 [6]
 FPC counsel informs us that the Commission has determined that the tap and valve facility is not a major federal action for purposes of NEPA
 
 
 [7]
 Mobil Oil Corp. v. FPC, 149 U.S.App.D.C. 310, 313, 463 F.2d 256, 259 (1971), cert. denied, 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676 (1972)
 
 
 [8]
 Note the distinction between "natural" and "manufactured" gas drawn by Sen. Wheeler in 81 Cong.Rec. 9316 (1937), quoted in text accompanying note 16 Infra
 
 
 [9]
 50 FPC at 660
 
 
 [10]
 H.R. 11662, 74th Cong., 2d Sess. § 1(b) (1936) (reprinted in 1 F. V. Roach & W. E. Gallagher, A Compilation of the Legislative History of the Natural Gas Act 1, 2 (1968)); Committee print of H.R. 5423, 74th Cong., 1st Sess. § 302 (June 22, 1935) (originally introduced on Feb. 6, 1935) (reprinted in 1 F. V. Roach & W. E. Gallagher, Supra, at A-43, A-44-45) ("The provisions of this title shall apply to the transmission of natural gas in interstate commerce in natural gas pipe lines and to the sale of natural gas at wholesale for resale in interstate commerce, but shall not apply to any other sale of natural gas. The Commission shall have jurisdiction over all facilities used for such transmission or sale of natural gas but shall not have jurisdiction over low-pressure or service lines.")
 
 
 [11]
 74th Cong., 2d Sess. (1936)
 
 
 [12]
 Hearings on H.R. 11662 Before a Subcomm. of the House Comm. on Interstate and Foreign Commerce, 74th Cong., 2d Sess. 92, 98 (1936)
 
 
 [13]
 Id. at 90 (emphasis added)
 
 
 [14]
 Id. at 104
 
 
 [15]
 Hearings on H.R. 4008 Before the House Comm. on Interstate and Foreign Commerce, 75th Cong., 1st Sess. 21 (1937)
 
 
 [16]
 81 Cong.Rec. 9315-16 (1937)
 
 
 [17]
 95 S.Ct. at 1074
 
 
 [18]
 95 S.Ct. at 1081
 
 
 [19]
 95 S.Ct. at 1082
 
 
 [20]
 In Louisiana Power & Light, the Supreme Court held that the FPC has the power to effect curtailment plans that control deliveries to all customers, including industrial "direct sale" customers who purchase gas for their own consumption despite the language of § 1(b), which makes the Act applicable only to the interstate transportation of natural gas and the interstate sale of natural gas for Resale. However, the Court found a warrant for this apparent expansion of FPC jurisdiction, not only in the need for regulation, but in the language of § 1(b). The Court said that the effectuation of curtailment plans fell within the FPC's power to regulate "transportation of natural gas," and that the head of jurisdiction limited to "sales for resale" referred only to the rate-setting powers of the Commission
 
 
 [21]
 See also Mobil Oil Corp. v. FPC, 157 U.S.App.D.C. 235, 246, 483 F.2d 1238, 1249 (1973)
 
 
 [22]
 In Phillips, the Court held that the Commission had jurisdiction over "well-head" sales for resale in interstate commerce by independent producers to interstate pipelines, in the face of a contention that such sales were exempted by the proviso of § 1(b) excluding "the production or gathering of natural gas." The Court said that Congress had not intended to allow any wholesales of natural gas in interstate commerce to escape regulation. In United Gas Improvement, referred to as the Rayne Field Case, the Court held that FPC jurisdiction extended to the sales to pipeline companies of producers' leasehold interests in the land in which the gas was located, on the ground that such sales were the economic equivalent of conventional wholesales of natural gas. See the more extensive discussion in Mobil Oil Corp. v. FPC, Supra note 7, 149 U.S.App.D.C. at 315-16, 463 F.2d at 261-62
 
 
 [23]
 See 365 U.S. at 8, 81 S.Ct. at 439. The Court quoted this phrase from its CATCO opinion, with the significant addition of the italics emphasis for the word "all."
 
 
 [24]
 50 FPC at 664
 
 
 [25]
 We remanded so the decision below could be vacated, in accordance with United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950). See Order of August 14, 1974, in Public Service Comm'n v. FPC, No. 73-1428
 
 
 [26]
 50 FPC at 664
 
 
 [27]
 E. g., Tecon Gasification Co., 51 FPC 836 (1974), where the Commission affirmed an Administrative Law Judge's decision denying an application for a certificate of public convenience and necessity covering a mixture of artificial and natural gas on the ground that the applicant had not made the required showing that the project was economically sound
 
 
 [28]
 E. g., the regulation of the transportation by pipeline of oil and certain other commodities is the responsibility of the Interstate Commerce Commission under § 1(1)(b) of the Interstate Commerce Act, 49 U.S.C. § 1(1)(b) (1970). The transportation by pipeline of water and of natural and artificial gas is expressly exempted
 
 
 [29]
 42 U.S.C. § 4321 et seq. (1970)
 
 
 [30]
 See note 6 supra
 
 
 [31]
 "As Section 102(2)((C)) of (NEPA) makes explicit, unless a major federal action having a significant effect upon the human environment is involved, there is no requirement to prepare an environmental impact statement. If there is no statutory requirement for an impact statement with respect to jurisdictional facilities, it follows there is no need for one with respect to other non-jurisdictional facilities. Inasmuch as our staff has not yet completed its preliminary review of the environmental impact of the jurisdictional facilities, the issue of whether there is a major federal action having a significant effect upon the human environment is not yet before us. The issue raised by the intervenors is therefore premature at this time." 50 FPC at 666 (footnotes omitted)
 
 
 [32]
 Id. at 666 n. 33. The initiation of preparation of an impact statement reflects the conclusion that the project as a whole constitutes a "major federal action" for purposes of NEPA
 
 
 [33]
 For the proposition that it can limit its inquiry to the immediate environmental impact of jurisdictional facilities, the Commission refers us to Kitchen v. FCC, 150 U.S.App.D.C. 292, 464 F.2d 801 (1972), in which this court held that the FCC need not consider the environmental impact of the construction of a telephone exchange building because it has no jurisdiction over such buildings. In that case, the agency possessed no jurisdictional toehold over the construction. The FPC has plain jurisdiction over the transportation and sale for resale of synthetic gas mixed with natural gas, and over the construction of tap and valve facilities projected for that purpose