**PRINCE GEORGE'S COUNTY, MARY-
LAND, Plaintiff,**

v.

**Admiral James L. HOLLOWAY, III, Chief
of Naval Operations, et al.,
Defendants.**

**Paul FOX et al., Plaintiffs,**

v.

**Donald H. RUMSFELD, Secretary of De-
fense, et al., Defendants.**

Civ. A. Nos. 75–1437, 75–1823.

United States District Court,
District of Columbia.

Dec. 5, 1975.

Robert N. Boyer, Michael O. Connaughton, Assoc. County Attys., Upper Marlboro, Md., for plaintiff Prince George's County, Md.

Irwin L. Schroeder, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM

GESELL, District Judge.

Plaintiffs in these separate actions seek to prevent the Navy from proceeding with a proposed consolidation of the Naval Oceanographic Program and the transfer of its civilian personnel to a site in Mississippi owned by NASA. They rely primarily on the National Environmental Policy Act (42 U.S.C. § 4331 *et seq.*), and their motions for preliminary injunction have now been heard. Prince George's County, Maryland, presently accommodates the bulk of the facilities to be consolidated, and a majority of the personnel affected live in the County. Plaintiffs in *Fox* purport to represent affected employees, particularly those employees who have not yet determined whether to move or resign, a group which includes a substantial number of blacks. Since the motions were heard on the same record and a motion to consolidate is unopposed, the Court has determined that Fed.R.Civ.P. 42(a) is properly invoked and the actions are consolidated for purposes of the present motions.

The Naval Oceanographic Program is presently scattered among 19 separate facilities, mostly in the Suitland, Maryland, area, and employs some 1300 civilians. The Navy has been considering the desirability of consolidating the program for reasons of management efficiency since 1963 and consolidation has been deemed more urgent as the program has developed. After checking possibilities suggested in some 15 states, the choice was narrowed to ten sites, including Maryland. It then appeared that one site, that at Bay St. Louis, Mississippi, where NASA could offer unutilized facilities released with the termi-

nation of the Apollo Moon Program, was the most desirable for reasons of efficiency and cost. A decision was then made within the Navy to transfer to Bay St. Louis early in 1975 and NASA agreed to grant the Navy a 25-year permit in April, 1975. The consolidation and transfer involve expenditures by the Navy and NASA of about $19,000,000, and is admittedly a major federal action covered by the National Environmental Policy Act.

The Navy was, of course, well aware of the Act and purported to comply with its requirements. After preliminary assessment, a draft environmental impact statement was published in April, 1975; public hearings were held at Suitland and Bay St. Louis; and a Final Environmental Impact Statement was issued in July, 1975. The primary thrust of the impact statement was to determine the environmental effect of the move at Bay St. Louis. A discussion of the Bay St. Louis area was presented outlining the favorable and unfavorable aspects of the area as they might impinge on the quality of life of Oceanographic families moving in from Maryland and the Greater Washington Metropolitan Area.

The Navy considered five sites as "most competitive" for the proposed relocation (Environmental Impact Statement, Vol. I at 90). Among these were Suitland and Hyattsville, Maryland, as well as Bay St. Louis. Plaintiffs do not question the selection of these alternatives. The preliminary analysis demonstrated that environmental considerations were generally more favorable at the other four sites than at Bay St. Louis. These four sites were nevertheless rejected for reasons of economics and managerial efficiency in favor of Bay St. Louis, which admittedly created environmental problems involving schools, housing and race relations in the area.

A limited analysis was made of the impact on Prince George's County. While noting that there would be no environmental effect resulting from abandonment of the move in its entirety, the effect of the loss of the program was only mentioned in cursory fashion and new construction to permit consolidation at Suitland was considered too expensive and politically impractical. The Department of Defense over a period of time was aware that Congress looked with disfavor upon capital expenditures for military installations in the National Capital Area, which was deemed already too concentrated.

The complaints herein were filed on September 3, 1975, and November 3, 1975, after those opposed to the move had unsuccessfully sought aid of the Congress by attempting to block appropriations. When congressional committees approved appropriations to finance the move in spite of vigorous and persistent opposition, plaintiffs turned to the courts. The transfer of the Naval Oceanographic Program is now in progress. Buildings at the site are being refurbished, records are being shipped down, employees have been notified and some have sold homes and have moved. Other personnel are scheduled for transfer, if they agree, on a staggered basis over the next 18 months. The prayers for preliminary injunction were promptly heard after a temporary restraining order sought by Prince George's County was denied. Testimony was taken and numerous depositions filed. The issues were fully briefed and argued.

■ Before turning to the specific issues in controversy, it should be noted that the National Environmental Policy Act is typified by generalities and indefiniteness. It is a ringing statement of public policy and concern for the environment and in this respect it has been reinforced and emphasized by many regulations and policy pronouncements from sectors of the Executive Department. The Act is essentially a procedural and disclosure statute. Governmental decisions must be made with full awareness of their environmental impact, but the Act, at least in a situation like the present, contains no provision which

prevents the Government agencies involved from moving to a site which, among available alternatives, is clearly the least desirable environmentally. Thus the role of a federal court called on to review a federal action with environmental consequences is limited. Assuming the available alternatives have been generally identified, its sole function is to determine whether or not the requisite procedures were followed and appropriate disclosures made before the final administrative decision was reached. While this is a limited function, it is an essential one. If the National Environmental Policy Act is allowed to be a mere formality which busy bureaucrats can treat as an annoyance rather than as a vital aid in true decision making, the clear intent of Congress will be frustrated. It is not a matter of doing paper work to satisfy form; it is, rather, a matter of placing before the decision maker, ever conscious of efficiency and cost, the equal if not greater need to weigh factors affecting the quality of life on this overcrowded and rapidly deteriorating continent. This is the repeated and insistent holding of many courts that have confronted comparable problems under the Act. As the United States Court of Appeals for this Circuit stated in its seminal decision in *Calvert Cliffs Coordinating Committee, Inc. v. United States Atomic Energy Commission,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1128 (1971):

> NEPA requires that an agency must —to the *fullest* extent possible under its other statutory obligations—consider alternatives to its actions which would reduce environmental damage. That principle establishes that consideration of environmental matters must be more than a *pro forma* ritual. Clearly, it is pointless to "consider" environmental costs without also seriously considering action to avoid them. Such a full exercise of substantive discretion is required at every important, appropriate and non-duplicative stage of an agency's proceedings. (Emphasis in original.)

Plaintiffs advance several sharp challenges to what has occurred in this instance. They claim that necessary procedures and disclosures contemplated by the National Environmental Policy Act have not been followed or made. Without attempting at this stage to detail each of the many criticisms suggested by the papers, the Court, as will appear, considers the Environmental Impact Statement inadequate in two respects, which are decisive.

It is necessary, however, first to determine whether or not plaintiffs have the requisite standing to challenge the move to Mississippi. The Court has concluded that both plaintiffs have standing for the following reasons.

Much has been written on standing, including many cases arising under the National Environmental Policy Act. *See e. g., United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Gifford-Hill & Co. v. Federal Trade Commission,* 523 F.2d 730 (D.C. Cir.1975); *Commonwealth of Pennsylvania v. Morton,* 381 F.Supp. 293 (D.D.C.1974). The Court of Appeals for this Circuit has recently summarized the applicable test:

> A plaintiff has standing to challenge an administrative action in federal court if the challenged action caused it "injury in fact" and if "the alleged injury was to an interest 'arguably within the zone of interests to be protected or regulated' by the statutes that the agencies were claimed to have violated." *Gifford-Hill, supra,* at 731 (citations omitted).

The essential inquiry is to determine whether there is "injury in fact" and, if so, whether the injury is to an interest within the "zone of interests" protected by the statute, *id.* at 731.

■ Applying this standard, Prince George's County's standing to challenge the adequacy of the Environmental Impact Statement is established both because of the environmental impact on the County of relocating the Naval Oceanographic Program and the consideration given to Suitland and Hyattsville, Maryland, as acceptable alternatives to Bay St. Louis, Mississippi. These issues obviously directly affect Prince George's environment and are clearly within the zone of interest of the National Environmental Policy Act. In addition, the County also has standing to contest the adequacy of the Environmental Impact Statement as it relates to Bay St. Louis. Although Prince George's environment is not directly affected by what is done at Bay St. Louis, the Navy ultimately rejected acceptable competitive sites in the County in favor of relocating in Mississippi. Accordingly, Prince George's County has an immediate interest within the purview of the National Environmental Policy Act in ensuring that this decision was properly reached and, in particular, that the Environmental Impact Statement adequately reflected all adverse environmental effects of moving to Bay St. Louis. Only if this was done could a valid decision between Mississippi and Maryland have been made.

■ As for the plaintiffs in *Fox*, no class has yet been certified and the Court preliminarily considers for standing purpose only those plaintiffs within the alleged class who are currently employees of the Naval Oceanographic Office and related facilities and who remain "on the fence" in that they have not yet made the choice between losing their jobs or relocating to Mississippi but are seriously considering moving. This group is thus acutely concerned about the selection of the new site. Their concern clearly extends to environmental considerations, and hence these plaintiffs have an interest that is within the zone of interests protected by the

Act. Accordingly, they have standing to raise all NEPA issues.

The inquiry must now focus upon whether or not there has been compliance with the procedural or disclosure requirements of the National Environmental Policy Act. Procedurally it is claimed that the decision to select Bay St. Louis was made before the Environmental Impact Statement was completed and that NASA should have acted as a lead agency preparing its own impact statement before granting a permit to the Navy. These issues need not be resolved because the Environmental Impact Statement that was prepared is clearly deficient and hence an injunction must issue.

In order to review the sufficiency of the Environmental Impact Statement it is necessary briefly to recount the manner in which it was prepared. As already noted, NASA granted a 25-year permit to the Navy to occupy some of the facilities at Bay St. Louis. Beyond this, however, other than responding to limited questions by the Navy, NASA played no part in the development of the Environmental Impact Statement. The Navy, naturally focusing on its immediate special interests, concerned itself solely with the transfer of the Oceanographic Program to Bay St. Louis. This left an obvious and serious void in the environmental impact appraisal in that NASA, more or less contemporaneously, was negotiating with the Army under an arrangement that would contemplate placing some 5,000 employees at an Army ammunition factory to be built at the site. At the same time, NASA was also considering an expansion of its space shuttle program which would have created further concentration at the site. These matters would affect not only such obvious environmental factors as sewage and water supply, but would also place substantial additional strains upon housing and school facilities in the area.

■ The plaintiffs assert that the Environmental Impact Statement in this

case was inadequate for failing to consider, in conjunction with the relocation of the Naval Oceanographic Center at Bay St. Louis, the proposed actions by the Army and NASA. In response, the Government argues that these other actions were conjectural and uncertain at the time the Navy decided to move, and that therefore the impact statement was not inadequate in this regard. It is true that only those projects that are reasonably definite and contemporaneous with each other need be considered in a single impact statement. This is clearly a matter of degree. There is no litmus test to determine what should or should not be covered in an impact statement. It is for a court to resolve that question in light of the totality of all the facts and circumstances in each case.

■ Applying this test, the Court concludes that the proposed actions by the Army and by NASA should have been considered in the Navy's Environmental Impact Statement. While neither of these projects has received final approval, they have advanced beyond the point of conjecture and speculation. For several years the NASA facility at Bay St. Louis has been under-utilized, and NASA has been actively seeking to find additional uses and tenants for the site. Moreover, the Army's plan is now sufficiently concrete that a draft environmental impact statement has already been prepared. It is apparent to the Court on the present record that there is a strong possibility that these governmental units will also be occupying the site at Bay St. Louis together with the Navy.

In such a situation, the National Environmental Policy Act requires the impact statement to consider the cumulative environmental effect that the relatively concurrent federal actions may have at the common site. One of the primary purposes of the Act was to prevent the very type of fragmented and compartmentalized analysis that occurred here. Instead, the statute directs that the agency employ a more integrated and comprehensive approach which takes account of the overall effect of the various projects. *See Natural Resources Defense Council v. Callaway*, 524 F.2d 79 (2d Cir. 1975); *Henry v. Federal Power Commission*, D.C., 513 F.2d 395, 406 (1975); 40 C.F.R. § 1500.6(d) (1975) (CEQ Guidelines). By failing to consider environmental issues against a more realistic and comprehensive background, the Environmental Impact Statement was fatally defective. This defect was created by the failure of NASA, as an immediately involved agency, to reveal its reasonably contemplated plans so that the Navy, in turn, could more fully evaluate the environmental effects of its proposed action. This deficiency in the impact statement must be corrected before the Navy may move.[1]

■ The Environmental Impact Statement is also inadequate in another respect. The relocation of the Naval Oceanographic Center to Bay St. Louis, Mississippi, raised obvious disturbing questions about the availability of adequate housing and schools for low- and moderate-income groups and racial minorities. There is no dispute that such considerations are of major environmental importance. Not only was this recognized by the Government at oral argument, but the Navy itself has properly considered such matters in its Environmental Impact Statement. *See also Hanly v. Mitchell*, 460 F.2d 640, 647 (2d Cir. 1972), *cert. denied sub nom. Hanly v. Kleindienst*, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972), *subsequent appeal sub nom. Hanly v. Kleindienst*, 471 F.2d 823 (2d Cir. 1972), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973), *subsequent appeal*, 484 F.2d 448 (2d Cir. 1973), *cert. denied*

---

1. Because of NASA's critical role in the preparation of a satisfactory environmental impact statement and the need to enforce the Court's injunction, defendants' motion to dismiss James C. Fletcher, the Administrator of NASA, is hereby denied.

*sub nom. Hanly v. Saxbe,* 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974); *Trinity Episcopal School Corp. v. Romney,* 387 F.Supp. 1044, 1078 (S.D.N.Y. 1974). Where, as here, adverse environmental effects are noted, the federal agency, as part of its statutory obligation to evaluate alternatives, must consider possible methods for ameliorating or mitigating the environmental impact at the site chosen. In the instant case, for example, where inadequate housing for minorities and low-income personnel is clearly a problem and this problem will be greatly enhanced by a fuller analysis which includes the Army and NASA plans, one alternative is to implement an affirmative action program directed to the housing problem. Another is to create more housing with federal funds or to obtain more concrete commitments from local officials. The NASA facility at Bay St. Louis is bounded by an undeveloped buffer zone which was once necessary to insulate against the noise emanating from the site. It now appears that this protection is no longer required, and the area therefore may be available for construction of housing that is needed for the increased number of employees. This would not only improve the housing situation, but might also minimize problems relating to commuting, automobile congestion and air pollution. These are, in a general sense, matters that must be examined and appraised before a decision consistent with the requirements of the Act can be made.

■ Having determined that there is a violation of the National Environmental Policy Act, the Court now confronts fashioning appropriate relief. To correct the situation, an adequate environmental impact statement must be prepared and the Secretary of Defense, in the light of the amended statement necessary here to comply, must objectively and in good faith reconsider the decision to consolidate the Naval Oceanographic Program at Bay St. Louis.[2] Until this is done, it is clear that no civilian employees, black or white, should be required to relocate to Mississippi against his or her will, and accordingly the Navy must be enjoined forthwith from compelling such personnel moves. The more difficult issue concerns the transfer of equipment and materials to Bay St. Louis and the renovation and construction presently occurring at ·that site. The Court has not been advised as to the details of these operations, and it is therefore unwilling in the exercise of its equitable discretion to enter an order immediately enjoining these activities irrespective of such considerations as expense and safety. Some flexibility is necessary. However, the Court is aware that additional improvements at Bay St. Louis may, as a practical matter, foreclose meaningful and objective reconsideration by the Navy of its decision to move to Mississippi. To accommodate these divergent considerations, the Court will direct that such activities be terminated at the next suitable ·and convenient time, but, in any event, no later than January 1, 1976, except as the Court may allow for good cause shown.

Preliminary injunction is granted.

---

2. If additional study reveals hitherto undisclosed environmental disadvantages of consolidating the Naval Oceanographic Program in Bay St. Louis which cannot be remedied, it may be necessary for the Secretary to conduct more detailed and complete evaluations of the alternative sites in order to make an informed and reasonable decision.