ALASKA FEDERATION FOR COMMU-
NITY SELF–RELIANCE, Trustees for
Alaska, Northern Alaska Environmental
Center, and Dave Lacey, Appellants,

v.

ALASKA PUBLIC UTILITIES
COMMISSION, Appellee.

Alaska Industrial Development And Ex-
port Authority and Golden Valley Elec-
tric Association, Inc., Intervenor–Appel-
lees.

No. S–6152.

Supreme Court of Alaska.

Aug. 26, 1994.

Rehearing Denied Oct. 3, 1994.*

* Rabinowitz, J., and Alexander O. Bryner, J. pro tem., dissented.

Michael M. Wenig, Trustees for Alaska, Anchorage, for appellants.

Virginia A. Rusch, Asst. Atty. Gen., Anchorage, Bruce M. Botelho, Atty. Gen., Juneau, for appellee.

Thomas F. Klinkner, Wohlforth, Argetsinger, Johnson & Brecht, Anchorage, for intervenor-appellee Alaska Industrial Development and Export Authority.

Julie Simon, Ron Saxton, Paul J. Kaufman, Ater, Wynne, Hewitt, Dodson & Skerritt, Washington, DC, for intervenor-appellee Golden Valley Elec. Ass'n, Inc.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ., and BRYNER, Justice pro tem.**

## OPINION

COMPTON, Justice.

■ The Alaska Public Utilities Commission (APUC) issued a certificate of public convenience and necessity for the Healy Clean Coal Project (HCCP), a coal-fired power plant in Healy, Alaska. The Alaska Federation for Community Self–Reliance, Trustees for Alaska, Northern Alaska Environmental Center and Dave Lacey (collectively, "the Federation") challenge APUC's decision. The Federation asserts that APUC failed to consider all factors bearing on the public interest, including the environmental "impacts" or "costs" and the costs of the federal and state subsidies allocated to the project. Additionally, the Federation seeks to invalidate APUC's decision because two APUC commissioners failed to participate in the final decision.[1]

** Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. The Federation included in its points on appeal three additional arguments that it did not brief: (1) two out of five APUC commissioners does not constitute a majority authorized to issue a certificate, (2) APUC's decision is illegal because it did not consider the number of Railbelt energy con-

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the mid–1980s the United States Department of Energy (DOE) inaugurated its Clean Coal Technology Program as a technology development experiment co-funded by government and industry. It was designed to "demonstrate a new generation of innovative coal processes in a series of full-scale 'showcase' facilities built across the country." The facilities would "comply with environmental, health, and safety requirements at costs that [would] keep coal competitive in the market place." DOE selected HCCP for participation in its demonstration program. HCCP is primarily a conventional coal-fired steam electric generating plant, designed to demonstrate two innovative technologies: advanced coal combustors and advanced emission control technology. HCCP will be located near Denali National Park.

HCCP will be owned by Alaska Industrial Development and Export Authority (AIDEA) and operated by Golden Valley Electric Association, Inc. (GVEA). AIDEA and GVEA negotiated an "Agreement for the Sale and Purchase of the Electric Capability of the [HCCP]." GVEA is to buy the power produced by HCCP. GVEA provides generation, transmission and distribution services to over 27,000 utility customers in Fairbanks, North Pole, Delta, Nenana, Anderson, Healy, and Cantwell.

There is government support for HCCP. DOE committed nearly $94 million to the project. The Alaska Legislature appropriated $25 million, plus the interest on that sum, to AIDEA for the design and construction of HCCP. Ch. 208, § 143, SLA 1990. Additionally, it authorized AIDEA to issue bonds for HCCP in a principal amount not to exceed $85 million. Ch. 123, § 28, SLA 1990.

Because AIDEA will be selling power generated by HCCP, it will be classified as a "public utility." AS 42.05.720(4)(A). Alaska Statute 42.05.221 provides that a public utility must obtain a certificate of public convenience and necessity to provide a utility service. Additionally, AS 42.05.431(b) requires advance approval by APUC of a wholesale power agreement between public utilities, such as the power sales agreement between AIDEA and GVEA.

In December 1991 AIDEA filed an application with APUC for a certificate of public convenience and necessity to own HCCP. That same month GVEA filed an application with APUC for approval of the proposed power sales agreement. In beginning its examination of the HCCP applications, APUC gave all parties the opportunity to brief the issue of whether it had jurisdiction to consider the "environmental externalities." The applicants specifically asked APUC to confirm that environmental externalities need not be addressed in the current proceedings. The Federation argued that APUC should consider the project's environmental costs in deciding whether to issue a certificate. APUC's staff concluded that "[APUC] has the legal authority to consider and include the costs and benefits associated with environmental externalities during a ratemaking proceeding, when determining whether a certificate should be granted, or whether a power sales agreement should be approved." Additionally, the staff opined that public policy supports investigation into the environmental externalities.

In May 1992 three of the five APUC commissioners rejected the staff's recommended approach. APUC ordered that absent an express direction from the legislature, "environmental externalities will not be considered in this proceeding." The two remaining commissioners agreed with the staff that APUC should consider HCCP's environmental impacts in its decision whether to grant the certificate as "required for the public necessity."

The Federation moved for reconsideration of the order. The motion was denied. The Federation next took an appeal to the superior court. AS 42.05.551(a); AS 44.62.560–

---

sumers whose rates will rise as a result of the project relative to the number whose rates will decline, and (3) the reasons articulated by APUC in support of its finding that HCCP is "required for the public convenience and necessity" are arbitrary, unreasonable and lack substantial evidence. Therefore, we treat these points as abandoned. *Jeffries v. Glacier State Tel. Co.*, 604 P.2d 4, 7 n. 8 (Alaska 1979).

.570; Appellate Rule 602(a)(2). The superior court stayed the appeal while APUC completed its remaining certification deliberations. In July 1992 APUC held an evidentiary hearing in which four commissioners participated. The three commissioners who voted against considering the project's environmental costs participated in the final certification order. Two of them decided to issue the certificate. In a lengthy dissenting opinion, the remaining commissioner objected to issuing the certificate without further study. The two commissioners who had previously dissented from the order refusing to consider environmental externalities did not participate in APUC's final decision, although one of them actively participated in the hearing.

Appellant Dave Lacey moved unsuccessfully for reconsideration of APUC's final licensing decision. The Federation then timely took a second appeal to the superior court. The superior court consolidated that appeal with the Federation's first appeal. One procedural argument raised in the Federation's briefs was that the certificate was invalid because it lacked the requisite majority vote of the five commissioners who participated in the overall certification proceeding. Although it rejected that argument, the superior court raised a related issue: whether the two commissioners who declined to participate in the final certification decision violated a legal duty as sworn public officers to participate. Following oral argument, the superior court expressed its personal outrage that the two commissioners had abstained from participating for no reason articulated in the record, but held that it could find no relevant law on the issue. Thus it sustained APUC's decision.

The superior court also rejected the Federation's position that the HCCP certification proceeding requires consideration of the project's environmental impacts. Although the court opined that environmental externalities should be considered, it stated that APUC is not required to consider them.

This appeal followed. The superior court issued an order granting the Federation's motion to stay issuance of HCCP's certificate pending this court's decision on the Federation's appeal. On February 1, 1994, we granted the parties' joint motion for an expedited appeal prior to the expected start of construction, which was May 1, 1994. On April 28 we affirmed the judgment of the superior court. Additionally, we vacated the superior court's order granting the Federation's motion to stay the APUC's issuance of the certificate of public convenience and necessity. In this opinion we articulate the bases for our April 28 order.

## II. DISCUSSION

### A. STANDARD OF REVIEW.

■ This court independently reviews APUC decisions. No deference is given to the superior court's decision when it acts as an intermediate court of appeal. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987).

■ Whether the Alaska Public Utilities Act requires APUC to consider all of HCCP's costs, including environmental impacts and public subsidies, in deciding if the service is "required for the public necessity," involves a question of law which the court reviews de novo. *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992). Additionally, whether a decision of APUC requires more than a quorum to transact business is a question of law which the court reviews de novo. *Id.*

### B. DETERMINATION OF THE PUBLIC CONVENIENCE AND NECESSITY DOES NOT REQUIRE THE APUC TO CONSIDER THE COSTS ASSOCIATED WITH PUBLIC SUBSIDIES OR ENVIRONMENTAL EXTERNALITIES.[2]

Alaska Statute 42.05.221 requires a public utility to obtain a certificate of public conve-

---

**2.** The Federation uses the term "environmental externalities" interchangeably with the terms "environmental impacts" and "environmental costs." GVEA argues that "environmental externalities" are not the equivalent of "environmen-

tal costs" and "impacts." It contends that environmental externalities encompass only environmental impacts that are "not internalized elsewhere in the permitting process." GVEA points out that the environmental issues associated with

nience and necessity in order to provide a utility service.[3] Alaska Statute 42.05.221(a) provides in part:

> A public utility may not operate and receive compensation for providing a commodity or service without first having obtained from the commission ... a certificate declaring that public convenience and necessity require or will require the service....

Alaska Statute 42.05.241 prohibits issuance of a certificate "unless the commission finds that the applicant is fit, willing and able to provide the utility services" and that the "services are required for the convenience and necessity of the public." This section

then permits APUC to "attach to the grant of [the certificate] the terms and conditions it considers necessary to protect and promote the public interest."

■ The Federation contends that APUC violated its statutory duty to consider all factors bearing on the public "necessity" for HCCP or, in other words, on whether allowing certification of HCCP serves the "public interest." The Federation asserts that "public necessity" suggests a more stringent threshold for project approval than "public interest," but that both standards require consideration of a broad range of factors bearing on the overall public good.[4] Specifi-

---

this project are currently pending before the appropriate state and federal agencies in the form of applications for the necessary permits to operate the facility, including compliance with procedures required by the National Environmental Policy Act (NEPA) review process. For example, NEPA requires agencies to prepare a statement on the environmental impacts for all proposed federal actions that "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(2)(C) (1989).

APUC defines "environmental externalities" as those impacts on the environment caused by the production of electricity "which have not historically been reflected in the costs of electricity." We find APUC's definition the most accurate.

**3.** " '[S]ervice' means, unless the context indicates otherwise, every commodity, product, use, facility, convenience or other form of service that is offered for and provided by a public utility for the convenience and necessity of the public." AS 42.05.720(6).

**4.** The Federation cites cases that have expansively construed the phrase "public convenience and necessity." *See, e.g., Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 8, 81 S.Ct. 435, 439, 5 L.Ed.2d 377 (1961) (emphasizing that the duty "to evaluate *all* factors bearing on the public interest," is part of the "accepted meaning" of the term "public convenience and necessity."); *United States v. Detroit & Cleveland Navigation Co.*, 326 U.S. 236, 241, 66 S.Ct. 75, 77, 90 L.Ed. 38 (1945) ("The [Interstate Commerce] Commission is the guardian of the public interest in determining whether certificates of convenience and necessity shall be granted.... Its function ... [includes a determination] from its analysis of the total situation on which side of the controversy the public interest lies."); *Cascade Natural Gas Corp. v. Federal Energy Regulatory Comm'n*, 955 F.2d 1412, 1421 (10th Cir.1992) (When making its public convenience and necessity determination, "the Commission must consider all factors bearing on the

public interest, not simply those immediately relating to the objects of its jurisdiction.").

Additionally, the Federation has cited cases it asserts have construed the "public interest" analysis as requiring an inquiry into environmental factors. APUC and AIDEA correctly respond that these cases are based on language in the governing statutes which is not applicable to the deliberations of the APUC. *See, e.g., Scenic Hudson Preservation Conference v. Federal Power Comm'n*, 354 F.2d 608, 614–15 (2d Cir.1965), *cert. denied sub nom. Consolidated Edison Co. of N.Y. v. Scenic Hudson Preservation Conference*, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966) (requirement of environmental consideration was premised on 16 U.S.C.A. § 803(a) which provided in part that recreational purposes be considered); *Public Serv. Co. v. United States Nuclear Regulatory Comm'n*, 582 F.2d 77, 81 (1st Cir.), *cert. denied*, 439 U.S. 1046, 99 S.Ct. 721, 58 L.Ed.2d 705 (1978) (required consideration of environmental effects under the National Environmental Policy Act (NEPA), rather than the statute under which the Commission was authorized to certify a facility). *But see Henry v. Federal Power Comm'n*, 513 F.2d 395, 406–07 (D.C.Cir.1975) (holding that consideration of environmental damage from only one part of a project is "inconsistent with the FPC's obligation, both under NEPA *and* under the Natural Gas Act.... The FPC's concern in, ... a ... proceeding to certify [for public convenience and necessity] the critical interconnection facilities, will encompass an evaluation of *all* the elements of the gasification project. The burden of environmental damage from that overall project is an important part of this total evaluation.") (Emphasis added).

Finally, the Federation analogizes APUC's public necessity inquiry to a statutory charge of the Alaska Department of Natural Resources (DNR). Alaska Statute 38.05.035(e) prohibits DNR from disposing of state lands without first determining that "the interests of the state will be best served" by such disposals. We are unpersuaded

cally, it contends that APUC erred by refusing to consider the public costs of environmental impacts resulting from HCCP and the costs of the public subsidies on which it is dependent.[5]

APUC responds that it is not required by law to consider factors outside its traditional area of jurisdiction. It argues that the environmental damage that is caused by electric generating plants for which society must pay, as well as costs associated with public subsidies, are not costs that have

> in the past been included in the rates paid by users of the electricity. Since the traditional purview of utility regulatory commissions is the reasonableness of rates charged by utilities and paid by consumers, any additional costs to society at large are not within the traditional area of policy making that the legislatures have assigned to utility regulators.

It argues that the case law presented by the Federation merely supports a contention that APUC has the discretion to determine what factors are relevant to certification of a utility service. It claims that the case law does not support an interpretation of statutory authority that would *compel* an examination of factors which are outside the purview of traditional utility regulation. APUC concludes that it did "not err in deciding that it would not consider environmental 'externalities' unless specifically directed to do so by the legislature."

Additionally, AIDEA posits that the public convenience and necessity requirement is directed only toward the authorization of a utility *service* and is inapplicable to the construction of a particular facility.

We agree that the language of AS 42.05.221, which requires a showing of public convenience and necessity, is limited specifically to "services." As the superior court noted, APUC only needs to make a determination whether there is a substantial need for a service. Similarly, the requirement of section 241 that APUC find the applicant to be "fit, willing and able to provide the utility services applied for" only requires the commission to focus on the applicant. Neither inquiry requires an exploration into the costs associated with environmental externalities or public subsidies not paid by consumers as part of the rate charged for the service. APUC is required only to determine whether the "service" is required for the public convenience and necessity and whether the applicant is fit, willing and able. This it has done. APUC's decision is not invalid by its refusal to consider these costs.[6] Therefore, we affirm APUC's certification determination.[7]

---

by this analogy. As discussed *infra*, we find that the public necessity inquiry required for certification of a service is more limited.

5. The Federation argues that APUC treated the subsidies as "freebies" and did not include them as public costs of HCCP. Additionally, it asserts that APUC assumed no subsidies for alternative energy sources. It contends that there is no evidence in the record that HCCP is the only project which could have been eligible for state and/or federal subsidies. The Federation asserts that by failing to factor these subsidies into the requirement of "public convenience and necessity," HCCP was treated differently than alternative energy supplies. It argues that AIDEA and GVEA "have in effect dictated the outcome of the [APUC's] 'public interest' analysis by their choice, in advance of that analysis, of which project to seek public subsidies to support."

6. We are unpersuaded by the dissent's interpretation of *Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961). The dissent relies on *Transcontinental* as authority to support its view that APUC is required to consider environmental

externalities. We interpret *Transcontinental* differently.

First, it is significant to point out that although the Court in *Transcontinental* utilized the "all factors" dicta in *Atlantic Refining Co. v. Public Serv. Comm'n*, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959), it noted that "the Natural Gas Act did not give the [Federal Power Commission] comprehensive powers over every incident of gas production, transportation and sale." *Transcontinental*, 365 U.S. at 8, 81 S.Ct. at 439. Additionally, the Court discussed the Commission's review of air quality and end use in terms of "abuse of discretion". *Id.* at 31 ("All we hold is that the Commission did not abuse its discretion in considering, among other factors, those of end use, preemption of pipeline facilities and price in deciding that the public convenience and necessity did not require the issuance of the certificate requested."). Therefore, we find the dissent's reliance on *Transcontinental* unpersuasive.

7. The Federation has also alluded to the "public interest" language in AS 42.05.241. This language requires a broader inquiry than the limited

## C. A MAJORITY VOTE OF A STATUTORY QUORUM IS SUFFICIENT FOR APUC TO TRANSACT BUSINESS.

Two of the five APUC commissioners did not participate in the final certification decision.[8] The nonparticipating commissioners dissented from APUC's prior order that held there would be no consideration of environmental externalities. One of the two did not participate in the evidentiary hearing leading to the final order. The other who abstained was an active participant in the hearing, asking questions almost to the end of the hearing.

The Federation asserts that the certificate for HCCP should be declared void because the two commissioners who did not participate in the voting had a legal duty to vote on the issue. It argues that this duty arises from the fact that they are "public officers" of the State of Alaska. AS 39.52.960(21)(B) (a member of a commission is a public officer). As public officers, the commissioners take a constitutional oath of office, pledging to "faithfully discharge" their duties to the "best" of their "ability." AS 42.05.081; Alaska Const. art. XII, § 5. Additionally, the Federation analogizes the duty of the commissioners to vote to the duty of judges to

sit. *Amidon v. State,* 604 P.2d 575, 577 (Alaska 1979) ("[A] judge has as great an obligation not to disqualify himself, when there is no occasion to do so, as he has to do so in the presence of valid reasons."); *In re Ellis,* 108 B.R. 262, 266 (D.Hawaii 1989) (a judge may not recuse herself simply because she does not want to hear the matter, because of the difficulty of the subject matter, or even because of calendar constraints). The Federation argues that "as public officers, APUC Commissioners should be bound by the same duty as Judges, absent a formal excuse based on sound reasons."[9] It asserts that this will further public trust and promote governmental accountability by providing a record of official conduct.

■ APUC, AIDEA, and GVEA respond that even if the court finds the nonparticipation of the two commissioners wrongful, the requested relief of setting aside a decision of a statutory quorum of the commission is inappropriate.[10] We agree.

■ Alaska Statute 42.05.071 provides that "[t]hree members of the commission constitute a quorum for the transaction of business, for the performance of a duty, or for the exercise of a power of the commission."[11] *See* Henry M. Robert, *Robert's*

---

inquiry concerning public convenience and necessity and applicant fitness, but it has a narrower application. It relates solely to the question whether "terms and conditions" should be attached to a certificate. Because appellants did not advocate any such terms and conditions before the commission with respect to environmental factors, the issue of whether and to what extent environmental factors must be considered under the public interest standard of section 241 is not before us. The question at issue in this case is whether APUC is required to consider costs associated with environmental externalities and public subsidies in its *certification* decision.

8. The record does not disclose the reasons for the two commissioners' nonparticipation other than that offered in oral argument to the superior court. Counsel asserted that both commissioners requested to be removed from the panel. One of the two commissioners was excused at her own request because of other pressing business. APUC also asserts that it is a long standing practice of APUC to assign only three commissioners to sit as a panel on any case.

9. *See* 2 Am.Jur.2d *Administrative Law* § 435 (1962) ("As a general rule the nonparticipation of

one or more members of a board or commission in the rendition of the decision, because of *intervening death, illness, retirement, or similar reason,* will not affect the action taken by remaining members who constitute ... the quorum required by statute. However, it is quite desireable that members of a board which heard the evidence participate in the decision....") (emphasis added) (footnote omitted).

10. AIDEA argues that if this court finds that a commissioner breaches his or her duty to the public by not voting, this is nothing more than evidence that the commissioner should be removed from office. It does not provide a basis for voiding an action taken by the majority of the quorum.

11. The Federation argues that AS 42.05.071 was intended to address circumstances when a commissioner's office is vacant. *See* AS 42.05.030(c) ("A vacancy in the commission does not impair the authority of a quorum of commissioners to exercise all the powers and perform all the duties of the commission."). However, it cites no support for this proposition.

*Rules of Order Newly Revised* § 39 (Scott, Foresman & Co. 1990) [hereinafter *Robert's Rules* ] ("[A] quorum in an assembly is the number of members entitled to vote who must be present in order that business can be legally transacted. The quorum refers to the number of such members *present,* not the number actually voting on a particular question.").[12] Furthermore, a majority of the quorum can act for the entire body. *See Federal Trade Comm'n v. Flotill Prods., Inc.,* 389 U.S. 179, 183, 88 S.Ct. 401, 404, 19 L.Ed.2d 398 (1967) ("The almost universally accepted common-law rule is ... in the absence of a contrary statutory provision, a majority of a quorum constituted of a simple majority of a collective body is empowered to act for the body."); 1976 Formal Op.Att'y Gen. No. 14 ("[W]hen only three members [of the Public Utilities Commission] are sitting a minimum of two members concurring is all that is required for the commission to act."); 2 Am.Jur.2d *Administrative Law* § 196 (1962) ("[U]nless a statute provides otherwise the generally accepted rule is that ... a majority of the quorum concurring is sufficient to take any particular action.").

■ Where a statute is silent on the number of votes necessary for a body to take action, the common law states that a majority of the quorum is sufficient to transact the business of the body.[13] In this case, a statutory quorum was present. A majority of the required quorum voted. While it would have been preferable for all five commissioners to have voted, the nonparticipation of the two commissioners is not grounds for invalidating

the decision of a majority of a statutory quorum.[14] As stated by APUC, "The subject matter of AS 42.05.071 is not a commissioner's duty of participation. The subject matter of AS 42.05.071 is the specification of a minimum number of commissioners who must participate in a valid commission action on any matter before the commission."[15] Therefore, APUC's decision is not invalid on the ground asserted.

### III. CONCLUSION

■ APUC is not required to consider costs associated with environmental externalities or public subsidies in its inquiry concerning whether a *service* is required for the public convenience and necessity, or whether an applicant is fit, willing and able to provide the service. It is only required to determine whether there is a substantial need for the service and whether the applicant is in fact fit, willing and able. Furthermore, while it might have been preferable for all APUC commissioners to have participated in the final certification decision, nonparticipation by two members does not invalidate a decision made by the majority of a statutory quorum. Therefore, we AFFIRM the decision of the superior court.

RABINOWITZ, Justice, with whom BRYNER, Justice, pro tem., joins, dissenting.

I dissent from the majority's conclusion that APUC's responsibility for determining whether AIDEA should be granted a certificate of public convenience and necessity, pursuant to AS 42.05.221 and 42.05.241,[1] for the

---

**12.** APUC has adopted the 1990 edition of *Robert's Rules* as a guide for the conduct of its public meetings. 3 Alaska Administrative Code (AAC) 48.184 (1993).

**13.** "So much of the common law not inconsistent with the Constitution of the State of Alaska or the Constitution of the United States or with any law passed by the legislature of the State of Alaska is the rule of decision in this State." AS 01.10.010.

**14.** One reason to favor participation of all commission members on each decision is the required diversification of APUC. The Alaska Public Utilities Commission Act, AS 42.05.010–.721, requires that the five-member commission be comprised of one lawyer, one engineer, one business person/accountant and two consumers. AS

42.05.040. However, as stated *supra,* the legislature has not mandated more than a majority vote of the statutory quorum in order for APUC to transact business.

**15.** Because we conclude that APUC's decisions are valid when a majority vote of the statutory quorum is obtained, we do not address the issue of whether the two nonparticipating officers breached any public duty.

**1.** Alaska Statute 42.05.221(a) provides:

A public utility may not operate and receive compensation for providing a commodity or service without first having obtained from the commission under this chapter a certificate declaring that public convenience and necessity require or will require the service. Where a

Healy Clean Coal Project did not require APUC to consider environmental externalities.

Federal case law supports a contrary holding, to the effect that under AS 42.05.221 and AS 42.05.241 APUC is required to consider all factors bearing on the convenience and necessity of the public, including environmental costs or impacts. Like AS 42.05.221 and AS 42.05.241, § 7(e) of the Natural Gas Act of 1938, 15 U.S.C. § 717f(e), requires the Federal Energy Regulatory Commission [2] to find that a proposed service is or will be required by "public convenience and necessity" [3] before FERC can issue a certificate. Under this provision, FERC must consider "*all* factors bearing on the public interest." *Federal Power Comm'n v. Transcontinental Gas Corp.*, 365 U.S. 1, 8, 81 S.Ct. 435, 439, 5 L.Ed.2d 377 (1961) (quoting *Atlantic Refining Co. v. Public Serv. Comm'n*, 360 U.S. 378, 391, 79 S.Ct. 1246, 1255, 3 L.Ed.2d 1312 (1959)); *see also Cascade Natural Gas Corp. v. FERC*, 955 F.2d 1412, 1421 (10th Cir.1992).

In *Transcontinental*, a single Federal Power Commission hearing officer held that he could not consider the effects of proposed utility services on air quality, contrary to recommendations by Federal Power Com-

mission staff. 365 U.S. at 5, 81 S.Ct. at 438. The full Federal Power Commission reviewed the decision, and held that it could consider effects on air quality under § 7. *Id.* at 5–6, 81 S.Ct. at 438. The United States Supreme Court agreed, holding that the Federal Power Commission had not exceeded its authority. *Id.* at 31, 81 S.Ct. at 451. The Court's holding focused on preemption of facilities and price. *See id.* Yet in the absence of more explicit treatment, it is significant that the Court did not criticize the consideration, at either stage, of environmental factors. Indeed, the Court reiterated that the Federal Power Commission must consider "*all* factors bearing on the public interest." *Id.* at 8, 81 S.Ct. at 439.

Although the majority acknowledges the federal case law in this area, it fails to cite any contrary decisions, from any jurisdiction, that construe similar language. It attempts to distinguish the relevant federal cases by noting that some rely on statutory language unlike the provisions governing APUC. I find this argument unpersuasive. Though the argument is ostensibly made in reference to *Transcontinental*, *United States v. Detroit & Cleveland Navigation Co.*, 326 U.S. 236, 241, 66 S.Ct. 75, 77, 90 L.Ed. 38 (1945), and *Cascade*, the citations that follow the majori-

public utility provides more than one type of utility service, a separate certificate of convenience and necessity is required for each type. A certificate must describe the nature and extent of the authority granted in it, including, as appropriate for the services involved, a description of the authorized area and scope of operations of the public utility.

Alaska Statute 42.05.241 further provides:

A certificate may not be issued unless the commission finds that the applicant is fit, willing and able to provide the utility services applied for and that the services are required for the convenience and necessity of the public. The commission may issue a certificate granting an application in whole or in part and attach to the grant of it the terms and conditions it considers necessary to protect and promote the public interest including the condition that the applicant may or shall serve an area or provide a necessary service not contemplated by the applicant. The commission may, for good cause, deny an application with or without prejudice.

2. Most of the cases discussed in this dissent refer to the Federal Power Commission, the predecessor of FERC. *See* 15 U.S.C. § 717e. Although

the government body has changed, the applicable standard has remained the same.

3. Section 7(e) of the Natural Gas Act of 1938, 15 U.S.C. § 717f(e), provides:

Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, *is or will be required by the present or future public convenience and necessity;* otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the *public convenience and necessity* may require.

(Emphasis added).

ty's analysis on this point are to other cases.[4] The existence of these distinguishable federal cases does not change the fact that those courts that have considered the issue have held that the term "public convenience and necessity" includes all factors bearing on the public interest. It is notable that the majority ends its discussion of federal cases with a citation to *Henry v. Federal Power Commission*, 513 F.2d 395 (D.C.Cir.1975), and implicitly acknowledges that *Henry* represents federal authority that cannot be distinguished.[5]

The majority's central holding is that APUC is required only to determine whether "service is required for the public convenience and necessity" and, focusing solely on the applicant, "whether the applicant is fit, willing and able." It seems inconceivable that a particularized finding of fitness and ability can ever be made without a thorough explanation of the manner in which the applicant proposes to provide the service and the consequences that might result from provision of the service in that manner.

The majority also states that "APUC is required only to determine whether the 'service' is required for the public convenience and necessity." This begs the question of what "public convenience and necessity" means. For the reasons discussed above, I believe that the federal courts are correct in holding that "public convenience and necessity" encompasses consideration of environmental externalities.

The two primary policy arguments that the majority advances in support of its interpretation can be termed "redundancy" and "uncertainty." The majority suggests that there

is no need for the state to consider environmental impacts, since the United States Department of Energy (DOE) is involved. DOE completed a final environmental impact statement for HCCP in December 1993. Yet DOE based its assessment on the need for innovative coal-based technology, the goal of the federal Clean Coal Technology Program. The question DOE asked was whether the costs of HCCP outweigh the national benefits of potentially developing new coal-based power-generation technologies. That is fundamentally different from the question APUC is required to answer: whether Alaska's public convenience and necessity will be served by HCCP. Because the two inquiries are distinct, requiring APUC to consider environmental externalities would not be redundant. Moreover, I note that in some cases DOE or other federal agencies may not be involved. Under the majority opinion, environmental factors bearing on the public interest could then be overlooked altogether until after the proposed project has been certified.

As for the assertion that environmental consequences are too uncertain, and that "economically minded" agencies are incapable of considering environmental consequences, this seems overstated. The decisionmaking process can account for uncertainty or limited agency competence. Discounting for uncertainty is legitimate, so long as the agency makes a good-faith attempt to consider all issues affecting the public interest. And even if, as GVEA asserts, environmental externalities cannot be quantified, this does not mean they cannot be considered at all.[6]

---

**4.** These cases are distinguishable from the case at bar, because they do not reach the issue of the meaning of "public convenience and necessity." Instead, their respective holdings are based upon another statute, the National Environmental Policy Act, *Public Serv. Co. of New Hampshire v. United States Nuclear Regulatory Comm'n*, 582 F.2d 77, 81 (1st Cir.), *cert. denied*, 439 U.S. 1046, 99 S.Ct. 721, 58 L.Ed.2d 705 (1978), and another provision, § 803(a) of the Federal Power Act, *Scenic Hudson Preservation Conference v. Federal Power Comm'n*, 354 F.2d 608, 614 (2d Cir.1965), *cert. denied*, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966).

**5.** In *Henry* the D.C. Circuit held that both NEPA and § 7(e) of the Natural Gas Act required the

Federal Power Commission to consider environmental effects as part of the certification evaluation. *Id.* at 406–07.

**6.** I note that in approving AIDEA's application for a certificate to provide electrical power APUC stated it had determined that

AIDEA should be granted the requested certificate and that the power sales agreement between AIDEA and GVEA should be approved. These decisions are, however, subject to certain conditions. First, approval is subject to receipt by AIDEA of all environmental permits needed to construct and operate [the Healy Coal Project]. AIDEA agreed to this condition.

I am also unpersuaded by the majority's emphasis on the word "service" in the statute. The provision of power is a "service," and the consequences of providing that service include environmental damage.[7]

APUC's powers are to be "liberally construed to accomplish its stated purposes." AS 42.05.141(a)(1). Under the rules of statutory construction, a grant of express authority carries with it all powers and duties incidental and necessary to exercise of the express authority. As APUC's staff has noted:

> The Commission has the authority and duty to ensure: (1) that rates charged are just and reasonable; (2) the service provided is safe and efficient and required for the public convenience and necessity; and (3) that the conservation of resources used in the generation of electric energy is promoted.

The power to consider environmental externalities follows from these duties.

---

APUC then ordered AIDEA's application approved subject (in part) to the condition set forth above.

7. The "public convenience and necessity" standard in § 7 of the federal Natural Gas Act applies to a "service" *or* a "sale, operation, construction, extension, or acquisition." Because the federal law uses the conjunctive "or," the majority opinion's emphasis on the term "service" in AS 42.-05.221(a) does not mitigate its failure to distinguish federal case law.